*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 38**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

KEITH ROBERT VALLEJO,
*Appellant.*

No. 20180041
Filed July 29, 2019

On Direct Appeal

Fourth District, Utah County
The Honorable Judge Thomas Low
No. 151401024

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Solic. Gen.,
Salt Lake City, Ryan B. McBride, Christine Scott, Provo, for appellee

Michael D. Zimmerman, Troy L. Booher, Freyja R. Johnson,
Salt Lake City, for appellant

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶ 1 Keith Robert Vallejo appeals his convictions of ten counts of forcible sexual abuse and one count of object rape. A jury convicted Vallejo of sexually abusing two of his sisters-in-law while they lived with him and his family. Vallejo contends that his trial counsel provided constitutionally defective representation because he failed to move to sever the charges regarding each victim so that Vallejo could have two separate trials. Vallejo also claims that his counsel rendered ineffective assistance by failing to object to certain

testimony. In addition, Vallejo argues that the district court erred by admitting testimony that Vallejo claims were protected by attorney-client privilege. And finally, Vallejo seeks relief because on a couple of occasions during the trial, the court and a witness referred to Vallejo's sisters-in-law as "victims." We affirm the convictions.

## BACKGROUND

¶ 2  Keith Vallejo and his wife Kathleen lived in Provo with their six, and later seven, children.[1] J.K. frequently spent time with Vallejo, Kathleen, and their family.

¶ 3  Vallejo would often "pinch" or "slap" J.K.'s buttocks. When Vallejo hugged J.K., he would often "hold [her] and start biting [her] ear, . . . and would not let go" if she tried to pull away. J.K. often fell asleep on a couch at the Vallejo home and would sometimes awake to Vallejo massaging her feet. On some occasions, he massaged higher up her legs towards her thighs.

¶ 4 J.K. later stayed at the Vallejo home for a week and a half. While a guest in the home, J.K. slept on a couch in the living room. One night, J.K. awoke to Vallejo partially on top of her, with his hands rubbing her breasts over her clothing. J.K. froze. She moved to see if Vallejo would stop. He stopped for a moment, but eventually resumed his touching. At one point, he slowly started to pull down J.K.'s pants to reach his hand underneath them. After J.K. moved again, he stopped long enough that she could pretend to awaken and get up.

¶ 5 Over the next week, on five or six different nights, Vallejo continued to touch J.K. while she was asleep or appeared to be asleep on the couch. He touched her in different ways on different nights. At times, Vallejo touched and kissed J.K.'s breasts and buttocks. Vallejo also rubbed J.K's vagina. He touched her both over and underneath her clothing.

¶ 6 J.K. was afraid and pretended to be asleep when Vallejo touched her. She did not report the touching to anyone at that time. At the end of the week and a half, J.K. returned home.

---

[1] We recite the facts in a light most favorable to the jury verdict. *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only when necessary to understand issues raised on appeal." *Id.*

¶ 7  Vallejo sometimes spoke to his friend Rocky Steele about J.K. For example, on two or three occasions, Vallejo told Steele that J.K "was the pick of the litter" of the family. On another instance, Steele asked Vallejo about a bottle of perfume that he observed in Vallejo's truck. Vallejo said that it belonged to J.K. and while smelling it, commented, "[A]h, it just reminds me of [J.K.]."

¶ 8  Later that year, Kathleen's youngest sister, H.K., came to live with the Vallejos while she completed her senior year of high school. For most of that year, H.K. slept on the couch in the Vallejos's living room. Kathleen and H.K. often disagreed. H.K. regularly called her mother (Mother) and would seek her support in dealing with Kathleen.

¶ 9  Continuing a practice that began before H.K. moved in, Vallejo would routinely kiss H.K. on the cheek, give her long hugs, bite her ear, and slap her on the buttocks. At night, H.K. slept on the couch, often while Vallejo and Kathleen watched television near her. Vallejo typically sat next to H.K. on the bigger couch while she laid down. Kathleen sat on the smaller adjacent couch.

¶ 10  Vallejo would often massage H.K.'s feet while she was lying on the couch beside him. Sometimes he massaged H.K. while she was awake and other times she awoke to his massages. Over time, Vallejo "would progressively reach higher up [H.K.'s] legs and sometimes grab [her] butt, and start massaging" her buttocks. This occurred "many times." Vallejo touched her buttocks under her clothing more than ten times. One night, Vallejo massaged H.K.'s back and continued lower until he "reached his finger in between [H.K.'s] butt crack." H.K. reacted to the intrusion and Vallejo stopped.

¶ 11  On another occasion, H.K. awoke to Vallejo touching her breasts under her clothing. Vallejo had reached "his hand . . . up the back of [H.K.'s] shirt, and . . . was reaching around and touching [her] chest." H.K. pretended to be asleep, because she was "too afraid to do anything." H.K. testified that she was too frightened to say anything when Vallejo touched her in these ways and she typically pretended she was asleep. Vallejo touched H.K.'s chest "many" more times.

¶ 12  Another night, H.K. woke up on the couch to Vallejo massaging her legs and feet. Vallejo's hand then reached up her leg, under her pants, grasped her butt, and then "his finger slowly reache[d] under [her] underwear." He "slowly put[] his finger in [her] vagina, and . . . start[ed] stroking it."

¶ 13 After Vallejo stopped, H.K. cried. She then messaged a friend, telling her that she "need[ed] to talk to someone about the situation [she was in]." Kathleen awoke while H.K. was sending the message and reprimanded H.K. for using her phone.[2]

¶ 14 The next day, H.K. confided to her friend J.J. that Vallejo had "molested" her. J.J. testified that H.K. told her that her "sister's husband would come in when he thought that [H.K.] was asleep, and would start to touch her when he thought she was asleep."

¶ 15 A few days later, H.K. began sleeping upstairs in an unfinished bedroom out of fear that Vallejo would touch her again while she slept. H.K. stayed with the Vallejo family until she finished the school year. For the remainder of her stay, Vallejo did not touch her while she slept but continued to spank her buttocks and give her long hugs. H.K. moved to her parents' home at the end of the school year.

¶ 16 H.K. moved out of her parents' house when she began college. And at some point during the school year, she caught pneumonia. While H.K. was feeling poorly, Mother texted H.K. saying, "I woke up in the middle of the night and had a strong impression that you need a blessing.[3] Can you ask [friend] and one of his roommates today?"

¶ 17 H.K. told Mother that she had cried herself to sleep, that she did not want to talk about what was wrong, and that it had something to do with Kathleen and Vallejo. H.K. later testified, "I just felt like I should've told her the truth as to why I was crying, or why she felt like I needed a blessing, because that night I did need [a] blessing."

¶ 18 A few days later, H.K. and J.K. returned home for Christmas. Mother asked to talk to H.K. "about why [she] cried [herself] to sleep that night." H.K. began to cry and refused to talk

---

[2] Kathleen had previously restricted H.K. from using her cell phone as punishment for coming home after curfew.

[3] This is a reference to a practice of the Church of Jesus Christ of Latter-day Saints. The Encyclopedia of Mormonism describes "Blessing the Sick" in part as "[t]he gift of healing . . . through administrations of the . . . priesthood" that includes a "prayer of supplication and blessing." Nephi K. Kezerian, *Sick, Blessing the, in* ENCYCLOPEDIA OF MORMONISM 1308-09 (Daniel H. Ludlow ed., 1992).

with Mother. Mother asked her whether it was related to Kathleen and Vallejo. H.K. said that it was.

¶ 19 Because H.K. refused to disclose more, Mother called J.K. J.K. and H.K. then spoke to each other. J.K. came home and the two then talked generally about what had occurred to them. J.K. told her father (Father) "about the molestation" and the four—J.K., H.K., Mother, and Father—discussed what happened.

¶ 20 The sisters also disclosed the abuse to their church leader and sought guidance. The church leader told the sisters that he would contact the church's legal department and the church would "try to take care of it." While not entirely clear from the record, the church's attorneys apparently reported Vallejo's conduct to the police. A police detective eventually contacted H.K. and J.K. and sought a statement from each of them.

¶ 21 A church leader notified Vallejo of the allegations. After Vallejo learned of the allegations, but before charges were filed, Vallejo, Kathleen, and Vallejo's friend Steele met together at Vallejo's brother's farmhouse.[4] They spoke while waiting for Vallejo's brother—an attorney—to arrive. Steele was already aware of the allegations against Vallejo, as Kathleen had visited with him and his wife the previous day. On their way to and at the farmhouse, Vallejo discussed "the accusations and the stress of it, and the emotion of it" with Steele.

¶ 22 Before his brother [Brother] arrived, and in Kathleen's presence, Vallejo talked to Steele about things "that happened that weren't appropriate." Vallejo informed Steele that "he would lay on the couch with them, be on the couch with them[,] . . . be very close with them physically sometimes." Vallejo told Steele that on one occasion J.K. sat down on Vallejo's foot on the couch and that Vallejo "started to move his foot in a way to arouse her, to stimulate her." Vallejo stated, "that he was sorry about that, and . . . that it was just dumb." Steele testified that Vallejo never directly denied that he had engaged in the conduct that led to the charges, but that he insinuated that he had not.

---

[4] Steele was not a licensed attorney, but Vallejo may have believed that he was. Steele had graduated from law school but had not passed the bar exam. Steele worked in business development, but had, at times, either suggested or represented that he was an attorney.

¶ 23   The State charged Vallejo with ten counts of forcible sexual abuse, second degree felonies under Utah Code section 76-5-404 (2014), and one count of object rape, a first degree felony under Utah Code section 76-5-402.2 (2014).[5] The charges regarding J.K.'s allegations and H.K.'s allegations were tried together.

¶ 24 Prior to trial, Vallejo argued that his farmhouse conversation was privileged because he had been seeking legal advice from Steele. The district court disagreed with that characterization and concluded that the conversation between Steele and Vallejo "was a conversation among good friends" and the attorney-client privilege accordingly did not exist. As a result, the jury heard Steele testify about his conversation with Vallejo.

¶ 25 During H.K.'s testimony, the judge referred to her as a "victim" while responding to an objection: "[I]t sounds like it's just contextual for how the victim responded, so overruled." Vallejo's trial counsel immediately moved for a mistrial. Vallejo's counsel argued that a limiting instruction would not ameliorate the harm, and indeed, would only "make[] things worse." Counsel preferred that the judge not give a curative instruction. The district judge denied the motion for mistrial and elected to read to the jury an instruction based on the model jury instruction on the court's neutrality in order to avoid drawing the jury's attention to his use of the word "victim."[6]

¶ 26   H.K's friend J.J. testified that H.K. had said her "sister's husband would come in when he thought that she was asleep, and would start to touch her when he thought she was asleep." On cross-

---

[5] We use the version of the statute in effect at the time of Vallejo's conduct.

[6] The judge instructed:

> As the judge, I am neutral. I want to make sure you know that. If I have said or done anything that makes you think that I favor one side or the other, that was not my intention. Do not interpret anything that I have done as indicating that I have any particular view of the evidence or the decision that you should reach. My only roles in this trial are to see that the law is properly applied, and that the parties are accorded equal opportunities to present evidence. You are the sole judges of what the true facts in this case are.

examination, J.J. admitted that six months prior to trial, when she was talking to a prosecutor, she could not recall who had sexually abused H.K.

¶ 27 In his closing statement, Vallejo argued that this was evidence that J.J. had "made her story better for the trial." Vallejo did not object to this portion of J.J.'s testimony at the time, but in his motion for a new trial, he argued that her testimony was inadmissible.

¶ 28 Later in the trial, a police officer used the term "victim" three times while testifying. Vallejo's counsel eventually objected and stated, "That's the third time that [the police officer] used the word victim in referring to [H.K. and J.K.]," though he subsequently conceded that two of the references were not about H.K. and J.K. specifically. The prosecutor instructed the officer to not use the term victim.

¶ 29 The State called a clinical social worker as an expert witness. The expert used the term "victim" a total of nine times while testifying about reactions to sexual assault and misconceptions surrounding those who report sexual assault. The expert did not use "victim" to refer to H.K. or J.K. specifically, but to speak generally about individuals who suffer sexual abuse. After she had used the term three times, Vallejo's counsel asked that the expert use different language. The district court agreed. The expert followed the instruction with limited success—using the term victim six more times during the testimony, albeit she often caught herself and said client instead.

¶ 30 The jury found Vallejo guilty of all charges.

**ISSUES AND STANDARDS OF REVIEW**

¶ 31 Vallejo presents five arguments on appeal.

¶ 32 Three of Vallejo's claims focus on his counsel's performance. Vallejo alleges that his trial counsel was ineffective because: (1) counsel did not move to sever the charges based on the conduct involving J.K. from charges based on the conduct involving H.K.; (2) counsel did not object to J.J.'s testimony as inadmissible hearsay; and (3) counsel failed to object to testimony from H.K. and Mother regarding Mother's desire that H.K. receive a blessing— which Vallejo characterizes as a "spiritual manifestation confirming . . . the truthfulness of H.K.'s allegation."

¶ 33 Vallejo argues that in each instance his counsel's assistance fell below the constitutional floor. When presented with a claim of ineffective assistance of counsel, "[w]e review a lower court's purely

factual findings for clear error, but [we] review the application of the law to the facts for correctness." *Menzies v. State*, 2014 UT 40, ¶ 29, 344 P.3d 581 (alterations in original) (citation omitted).

¶ 34 Vallejo next argues that the communications at the farmhouse were protected by the attorney-client privilege and that the district court therefore improperly admitted the testimony. When the existence of a privilege turns on a question of law, we review for correctness. *See Moler v. CW Mgmt. Corp.*, 2008 UT 46, ¶ 7, 190 P.3d 1250. When the existence of a privilege turns on questions of fact, we give deference to the district court's underlying fact finding and do not set those findings aside unless they are clearly erroneous.

¶ 35 Finally, Vallejo contends that the in-court references to J.K. and H.K. as "victim" or "victims" were improper and prejudicial. It appears that Vallejo believes that his motion for a mistrial should have been granted on account of the judge's use of that term.[7] We review a district court's denial of a motion for mistrial under an abuse of discretion standard. *State v. Cardall*, 1999 UT 51, ¶ 19, 982 P.2d 79. Vallejo also claims ineffective assistance of counsel arising from counsel's failure to object sooner or more often to these references to "victim"—which we review under the same standards we have discussed above. *State v. Hutchings*, 2012 UT 50, ¶ 8, 285 P.3d 1183; *Menzies*, 2014 UT 40, ¶ 29.

## ANALYSIS

### I. Ineffective Assistance of Counsel

¶ 36 To succeed on an ineffective assistance of counsel claim, Vallejo must demonstrate that his trial counsel's performance was deficient and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 37 Vallejo must first "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This inquiry focuses on "whether counsel's assistance was reasonable considering all the circumstances." *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

---

[7] The other references to "victim" or "victims" occurred after the motion for mistrial and Vallejo did not renew the motion—which forms part of his claim for ineffective assistant of counsel.

counsel's perspective at the time." *Id.* at 689. As a result, the analysis is highly fact-intensive and context-dependent.

¶ 38 Our "scrutiny of counsel's performance must be highly deferential." *Id.* "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

¶ 39 A deficient performance on its own is not enough, however, because the "purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation," but rather "to ensure that criminal defendants receive a fair trial." *Id.* Therefore, Vallejo must demonstrate prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 40 Vallejo must make a satisfactory showing of both deficient performance and prejudice to prevail. "[I]f the defendant makes an insufficient showing on one [prong]," there is no need for us "to address both components of the inquiry." *Id.* at 697.

*A. Trial Counsel's Performance Was Not Deficient*
*Because the Decision to Not Move to Sever the Charges*
*Was, in This Instance, Objectively Reasonable*

¶ 41 Vallejo argues that his trial counsel should have moved to sever the charges arising from the conduct involving each victim. He contends that his trial counsel's asserted reason for failing to file the motion—because he "did not think the court would grant the motion"—demonstrates that counsel lacked a tactical basis for declining to file the motion, which Vallejo offers as per se evidence of unreasonable conduct. Vallejo argues that the motion would have succeeded because he had a right to separate trials on the counts involving H.K. and those involving J.K. Vallejo alleges that counsel's failure to sever the charges prejudiced him because the prosecution was able to "rely on testimony concerning [Vallejo's] purported conduct with the other sister to obtain convictions regarding each sister" and that the prosecution would not have been able to use each sister's testimony in separate trials because the Utah Rules of Evidence would have prevented the admission of the other sister's testimony.

¶ 42   Vallejo must make several interrelated showings to succeed on appeal. First, he must demonstrate that under the circumstances of the case, counsel's representation fell below an objective standard of reasonableness when he failed to file the motion to sever. *See Strickland*, 466 U.S. at 688. Vallejo must rebut the presumption that this constituted sound trial strategy. *See id.* at 689. Vallejo must also demonstrate that the motion would likely have been granted had it been filed. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 ("[T]he failure of counsel to make motions . . . [that] would be futile if raised does not constitute ineffective assistance." (alterations in original) (citation omitted)). And to demonstrate prejudice, Vallejo must demonstrate that a reasonable probability exists that the outcomes of the trials would have been different had the motion to sever been filed and granted. *See Strickland*, 466 U.S. at 694. We need only address the first point because Vallejo fails to demonstrate that his attorney offered deficient performance by neglecting to move to sever the charges.

¶ 43   Vallejo argues it was unreasonable for his trial counsel to fail to file a motion to sever the charges. Vallejo points to his trial counsel's affidavit in which his counsel asserts that he did not move to sever the charges because he "did not think the court would grant the motion." Based on this affidavit, Vallejo contends that counsel lacked a "tactical basis" for failing to assert the motion to sever—and that therefore this constituted ineffective assistance of counsel.

¶ 44   As an initial matter, the ineffective assistance of counsel inquiry focuses on whether the counsel's actions in question were objectively reasonable, not whether the counsel had a subjectively defensible reason for taking them. *See Strickland*, 466 U.S. at 688. "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). Thus, it is not enough to simply say that Vallejo's counsel didn't have a tactical reason for not moving to sever the charges; rather, the question is whether a reasonable attorney could have made the same decision.

¶ 45   And again, Vallejo says no—that there would be no sound tactical basis for an attorney to decide not to move to sever the claims. Indeed, Vallejo argues that under the relevant statute, Utah Code sections 77-8a-1(1) and (4), and our case law, he had a right to separate trials. And he argues that in separate trials he could have admitted testimony that supported his argument that the sisters colluded, while excluding unfavorable testimony about Vallejo's

conduct with the other sister.[8] Based on that, Vallejo maintains that no reasonable attorney would try the cases together.

¶ 46   In many cases, Vallejo might be right. There very well may be circumstances in which there is no reasonable basis for trying two cases together that could be tried separately. But this is not such a case. We can envision reasonable trial counsel opting for a single trial.

¶ 47   Vallejo's trial strategy focused on casting doubt on H.K.'s and J.K.'s testimony. During J.K.'s cross-examination, Vallejo emphasized several points designed to undercut J.K.'s credibility. Vallejo elicited that J.K. never said that she was "uncomfortable" to Vallejo while the abuse occurred. Vallejo explored J.K.'s asserted reasons for not reporting the abuse in an apparent attempt to undermine them. For example, even though J.K. had asserted that one of the reasons that she had never disclosed the abuse was because of fear that Vallejo might hurt her, she acknowledged that Vallejo had never threatened her. And J.K. testified that she did not disclose because she feared that no one would believe her, including her family and ecclesiastical leaders.

¶ 48   J.K. also asserted that she did not disclose because she was afraid of what would happen to her sister Kathleen. In addition, J.K. testified that she did not attempt to avoid the continued abuse by

---

[8] We are not as confident as Vallejo that trial counsel would have necessarily prevailed on a series of evidentiary motions which the court would have had wide discretion to decide. Vallejo assumes that the district court would have repeatedly found in his favor in a number of rulings: that a motion to sever would have been granted; that each sister's testimony would not have fallen under a rule 404(b) exception such that it could have been introduced in separate trials; or that, alternatively, the prejudicial value of each sister's testimony would have outweighed its probative value in separate trials such that rule 403 would have prevented its admission. And again, even if we assume that Vallejo could have convinced a court to rule in his favor on each of these motions, it is quite another thing to say that a reasonable attorney would necessarily share that confidence and advise a client that they would be able to run the table.

We note this without commenting on whether a motion to sever would have succeeded or on the outcomes of the series of evidentiary motions that would have allowed Vallejo to admit favorable testimony and exclude unfavorable testimony.

going home early or by checking into a motel. And J.K. testified that she never told Vallejo that she did not want to see him again but rather later asked to go on a trip with Vallejo and his family. Vallejo used this testimony to argue to the jury that J.K.'s failure to report the alleged abuse—or to at least warn her sister H.K.—was illogical and that the jury should therefore discredit her allegations.

¶ 49 Vallejo also attempted to undermine H.K.'s credibility. During H.K.'s cross-examination, she testified that on only one occasion did she ask Vallejo to stop touching her. Counsel contrasted the instance where H.K. asked Vallejo to stop touching her "butt" with her decision to "fake[] being asleep" on the other instances when he touched her at night on the couch. Counsel insinuated that it was illogical or implausible that H.K. would verbally protest Vallejo's conduct on one instance but not on others. Like J.K., H.K. testified that she did not leave the Vallejo home to evade the abuse.

¶ 50 H.K. also testified that she did not report the abuse to anyone other than J.J. Indeed, in response to questions, H.K. stated that she did not tell her parents of the abuse even though she had frequent conversations with her mother and spent time with her parents during their visits to Utah while the abuse was ongoing. Counsel argued that it was odd that despite being close to her mother, H.K. did not tell her about the abuse and solicited testimony to support that argument. For example, counsel asked H.K., "And you never, ever told your mother, who you loved, and who you're close to, that you were being sexually abused during this time, did you?" H.K. responded, "No, I did not." And during the closing argument, Vallejo's counsel asserted H.K. "tells her mother everything. Everything. That's the testimony in this case. She wouldn't have left this out."

¶ 51 Counsel elicited testimony about tension between H.K. and Kathleen. Vallejo emphasized H.K.'s fraught relationship with Kathleen to imply a motive to lie about the abuse. In his opening statement, Vallejo's counsel asserted that "[i]t was well known that there w[ere] problems between Kathleen and [H.K.]." And in his closing statement Vallejo's counsel characterized H.K. as "[t]his young lady, who was the youngest, who's been characterized as the baby, the spoiled one . . . she didn't like that the rules were being laid down." Counsel continued,

> They want you to believe . . . that while she's utterly capable of saying all sorts of things about Kathleen . . . somehow she couldn't take the additional step to saying, oh, and by the way, Kathleen's husband's

doing bad things to me that I don't want. . . . She's able to be combative with her sister every day, . . . and somehow she never mentions any of this stuff [to her mother].

All of this sought to undermine H.K.'s credibility by insinuating that she had a motive to want to fabricate allegations against Vallejo—to get back at Kathleen.

¶ 52 Counsel also spun a narrative that H.K. and J.K. colluded to fabricate the allegations. When trial counsel addressed the message that H.K. sent to a friend in the middle of the night after the rape, counsel stated, "[t]his is her testing the waters. Let's put this into context. Okay? This happens when she's in trouble for [breaking curfew after] the prom." During Vallejo's closing argument, trial counsel posed the question of "how can it be that [J.K. and H.K.] got these details [about the abuse] exactly the same?" Counsel urged the jury to "remember what the testimony was about that[:] [i]n December, . . . [J.K. and H.K.] got together in the bedroom and talked to one another," implying that they colluded to corroborate their allegations.

¶ 53 The challenge for Vallejo's strategy, however, is that he lacked evidence to show that J.K. had any motive to fabricate testimony, other than to support H.K.'s plan. Thus, Vallejo's appellate argument is premised on his belief that he had a strong defense against H.K.'s allegations but that defending against J.K.'s allegations would be more difficult.

¶ 54 For the purpose of this analysis, we assume Vallejo's characterization that he possessed a stronger defense against the charges related to H.K., and a weaker defense against those involving J.K.[9] We also assume that if he had moved to sever the charges, he would have been successful and would have subsequently obtained an acquittal on the case with the stronger defense.

---

[9] In so doing, we do not intend to indicate that we agree with Vallejo's assessment of the strength of his defense against the allegations dealing with H.K. The evidence of motive to fabricate allegations of sexual abuse—H.K. was upset with Kathleen's rules and discipline—perhaps only seems strong in comparison to the allegation that J.K. would fabricate to support H.K.

¶ 55   In this scenario, Vallejo would have been acquitted of five counts of forcible sexual abuse, each a second degree felony, and object rape, a first degree felony. And we assume that Vallejo would have faced a stronger risk of conviction in the case with the weaker defense. In this assumed universe, if convicted, Vallejo faced prison sentences for the five counts of forcible sexual abuse committed involving J.K. We agree with Vallejo that a reasonable attorney could have chosen a strategy that seeks to minimize prison time by trading the perceived advantages of having H.K. in J.K.'s case for the problems that having J.K. in H.K.'s trial might engender.

¶ 56 Counsel could have also considered an all-eggs-in-one-basket strategy: try the case with the stronger defense and the case with the weaker defense together. There, counsel hopes that the case with the "strong" defense (H.K. had a motive to fabricate) will pollute the other case—by impugning the credibility of the victim with no strong motive to fabricate—and lead to an acquittal on all charges. In this hypothetical, Vallejo potentially walks away from the trial without any prison time and without any criminal conviction at all.

¶ 57 Vallejo asserts that reasonable trial counsel could only select the former scenario. That is, he argues that "[r]easonable counsel would not have allowed charges involving JK to be put before the jury in a trial on the charges involving HK." He states that "[t]his is particularly true where the stakes involving HK were significantly higher"—as the charges involving H.K. included a first degree felony charge for object rape, whereas the other charges involving H.K. and all of the charges involving J.K. were second degree felonies.[10]

¶ 58 We take Vallejo's point. But Vallejo assumes that only strategies aimed at minimizing prison time could be reasonable. If Vallejo's goal was to avoid prison time altogether, reasonable trial counsel could have decided to pursue an all or nothing strategy. And it is logical to conclude that an attorney charged with representing a man in his forties, with no criminal history, and a position of relative

---

[10] It bears noting that the district court instructed the jury about their obligation when considering multiple charges. The instruction directed the jury that it had a "duty to consider each charge separately"; that for "each crime charged" it should "consider all of the evidence relating to that charge"; and that their "verdict on one charge does not determine [their] verdict on any other charge."

esteem in his ecclesiastical community, might prefer a strategy that is designed to avoid any conviction and prison time.

¶ 59   Vallejo anticipates this line of thinking and contends that in separate trials he could have excluded certain unfavorable evidence and "still introduced HK's claims in JK's case to show JK's motivation for falsely accusing him." At the same time, Vallejo contends that the prosecution could not have "rel[ied] on testimony concerning [his] purported conduct with the other sister to obtain convictions regarding each sister" because the testimony would have been inadmissible in the trial based on the other sister. Vallejo describes this as the "best of both worlds:" the exclusion of J.K.'s testimony that Vallejo abused her in H.K.'s trial but the inclusion of evidence of the tension between H.K. and Kathleen in J.K.'s trial that would suggest a motive for J.K. to lie.

¶ 60   To make this argument, Vallejo focuses on the evidence concerning motive. But motive was not the only issue counsel could have considered. If the jury did not buy Vallejo's argument that H.K. fabricated the allegations to get back at Kathleen, reasonable counsel could have concluded that Vallejo needed something else to argue. J.K.'s presence at the trial gave him another witness who he could argue should not be believed because of the delay in reporting and because she did not leave a home where she alleged she was suffering abuse.

¶ 61   Reasonable counsel could, as Vallejo's counsel did, point to the fact that J.K. did not warn H.K. about Vallejo's abuse when she learned H.K. would move into the Vallejo home. This gave Vallejo another set of arguments to try and cast doubt on H.K.'s—and J.K.'s—testimony. As such, even though there were reasons to believe that J.K.'s testimony would bolster H.K.'s, reasonable trial counsel could also conclude that J.K.'s testimony could be used to reinforce arguments about why the jury should discredit H.K.'s account and, in the process, throw doubts on J.K.'s account. And trial counsel may have legitimately reasoned that there was value in having both sisters sit in the courtroom for the jury to observe as they heard evidence and argument about the sisters' plan to fabricate testimony. Although reasonable trial counsel might have weighed all of this and moved to sever, reasonable trial counsel could also decide to try the cases together.[11]

---

[11] Other courts have similarly recognized that counsel can strategically decide to forgo a motion to sever. For example, the New

(continued . . .)

¶ 62   This leads us to agree with the district court that on these facts, trial counsel could have reasonably decided to not sever charges. This falls within the "wide range of reasonable professional assistance" that meets the constitutional standard of adequate representation. *See Menzies v. State*, 2014 UT 40, ¶ 76, 344 P.3d 581 (citation omitted) (internal quotation marks omitted). Because reasonable trial counsel could elect to try these cases together, Vallejo has failed to demonstrate that trial counsel's election to not file a motion to sever charges constituted ineffective assistance of counsel.

### B. Trial Counsel's Failure to Object to J.J.'s Testimony Was Not Unreasonable

¶ 63   Vallejo next claims that his trial counsel was ineffective for failing to object to testimony that J.J., H.K.'s friend, provided. According to Vallejo, J.J.'s testimony included impermissible hearsay that offered "no conceivable beneficial value to the defendant." Based upon his dim view of the testimony's value, Vallejo contends that his counsel rendered ineffective assistance by not objecting to its admission.

¶ 64   Specifically, J.J. testified that H.K. told her that "at night when she was asleep, . . . her sister's . . . husband would come in when he thought she was asleep, and would start to touch her when he thought she was asleep." J.J. testified that H.K. "said that he put like his hands down her pants."

---

Mexico Court of Appeals considered a claim of ineffective assistance after an attorney failed to sever charges relating to his client's alleged sexual abuse of two minors. *State v. Carabajal*, 2009 WL 6763560, at *1-2 (N.M. Ct. App. Feb. 23, 2009). That court noted that a severance motion would have likely been granted, but that it could not "conclude that it was irrational to attempt to undermine the more numerous and serious counts involving C.C. by including the allegations involving M.D. and her involvement in the alleged conspiracy" to fabricate allegations against the defendant. *Id.* at *2–3; *see also In re Gensitskiy*, 2018 WL 1730176, at *6–7 (Wash. Ct. App. Apr. 10, 2018) (rejecting claim that counsel provided ineffective assistance by failing to seek separate trials where there was a legitimate trial tactic to try the cases together—allowing the jury to hear some of the alleged victims recant and express doubt about their testimony).

¶ 65   The pretrial discussion about J.J. illuminates how both the State and Vallejo viewed the testimony. In advance of trial, the State notified Vallejo and the district court that J.J. would testify that "H.K. told her toward the end of J.J.'s freshman year, in 2014, that someone in her house was abusing her and she moved upstairs to avoid him." At a pretrial hearing, Vallejo's trial counsel requested a continuance so that he could speak with J.J. and investigate her testimony. Trial counsel explained that J.J. was "the only person who's not a family member that's going to provide any sort of corroboration." Vallejo's trial counsel explained to the court: "[W]e want to know about how, what sort of communication was going on between H.K. and J.J., you know, why it didn't come to light for so long. She tips the balance in this case. She's very important to us."

¶ 66 Vallejo's cross-examination reveals how he tried to illustrate that J.J.'s testimony changed over time in a manner beneficial to H.K.'s claims to bolster his broader argument that H.K. (and by extension J.K.) fabricated their accounts.

> Q. . . . [Y]ou were first asked to talk about this in a telephone conversation you had with [the prosecutor] . . . last year. Remember that?
> A. Yeah.
>
> . . .
>
> Q. Okay, and do you remember what you told him at the time?
> A. I think I told him what I just said [in the direct examination], yeah.
>
> . . .
>
> Q. I'm going to show you something that's been provided to us by the prosecutor's office, and I'm just going to ask you to read it to yourself, not out loud, but just read it to yourself.
> A. Okay.
>
> . . .
>
> Q. Okay. So now I want to talk to you about the phone conversation that you had with [the prosecutor]. . . .
>
> Q. . . . [W]hat you told him was, at that time, what you told the prosecutor was that [H.K.] said she was staying at her sister's house and a man was sexually abusing her, right?
> A. Yes.

Q. Okay. And you said you didn't recall if [H.K.] told
[you] who the man was. Right?
A. Yes.

Q. Okay. So, back in August, you didn't tell him
anything about it being her brother-in-law, or anything
else, you said it was just some man, and you didn't
remember who it was. Right?
A. Yes.

Q. And today you're telling us, oh, it's the brother-in-
law. Right?
A. Mm-hmm.

Through cross-examination, Vallejo's trial counsel revealed that J.J.'s testimony had changed and become more incriminating by trial. In his closing statement, Vallejo's counsel used this testimony to assert that J.J. "made her story better for the trial."

¶ 67 In a motion for new trial, Vallejo argued that J.J.'s testimony constituted inadmissible hearsay and that his trial counsel was ineffective for not objecting to its admission. The district court found that J.J.'s testimony regarding H.K.'s statements was properly admissible as a prior consistent statement.[12]

¶ 68 The district court concluded that "[t]he fact that HK's statement to [J.J.], in April of 2014, was before HK's meeting with JK was relevant and helpful to rebut the express or implied charge that HK collaborated with JK during the December 2014 meeting." The court continued, "Therefore, [J.J.]'s testimony regarding HK's April disclosure was properly admissible as a prior consistent statement under Utah Rule of Evidence 801(d)(1)(B)." Vallejo disagrees with the district court's conclusion that this was admissible testimony, and he claims that his trial counsel was ineffective for failing to object to the testimony.

---

[12] A statement is admissible as a prior consistent statement if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." UTAH R. EVID. 801(d)(1). Rule 801(d)(1)(b) only allows the admission of "premotive, consistent, out-of-court statements." *State v. Bujan*, 2008 UT 47, ¶ 11, 190 P.3d 1255.

¶ 69   As explained above, to prevail on a claim of ineffective assistance of counsel, Vallejo "must show, first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant." *Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 (citation omitted) (internal quotation marks omitted).[13]

¶ 70   Leaving aside the question of whether the statements violated the rule against hearsay, Vallejo's trial counsel had a reasonable tactical reason for not objecting to the testimony. J.J.'s testimony opened up the opportunity for Vallejo's counsel to reveal further inconsistencies in her story that aligned with his theory that the sisters had colluded to bring the charges—which is exactly the approach that Vallejo's trial counsel adopted during cross-examination and the closing argument. As described above, Vallejo's defense centered on questioning the credibility of Vallejo's accusers, and J.J.'s testimony helped him do that. Vallejo has not overcome the presumption that the challenged action—failure to object to J.J.'s testimony—was reasonable. *See Met v. State*, 2016 UT 51, ¶ 113, 388 P.3d 447. He has therefore failed to establish deficient performance.

### C. Trial Counsel's Failure to Object to H.K. and Mother's Testimony About Mother's Alleged Spiritual Impression Did Not Constitute Ineffective Assistance

¶ 71   Vallejo next claims that testimony Mother and H.K. gave about Mother's "spiritual impression" was inadmissible and that his trial counsel was ineffective for failing to object to it. He argues that this testimony "enabled the jurors to base their decision on their religious beliefs," in violation of rules 403 and 610 of the Utah Rules of Evidence, rather than on the evidence in the case. He asserts that "counsel had a duty to object to this inadmissible and prejudicial evidence and rendered deficient performance in failing to object."

¶ 72   During direct examination, the prosecutor questioned H.K. about the circumstances that led her to disclose the abuse to her

---

[13] "[T]he failure of counsel to make motions," or objections, that "would be futile if raised does not constitute ineffective assistance." *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (citation omitted) (internal quotation marks omitted). Here, we focus on the reasonableness of Vallejo's trial counsel's decision to not object to J.J.'s testimony. And we do not address whether an objection to the testimony would have prevailed had he made one.

family. As background, H.K. testified that "I was going to school, and . . . I was very sick, and my mother had texted me that . . . she had an overwhelming feeling like I needed a blessing. And she thought that it was related to the fact that I had pneumonia. And I told her that I had cried myself to sleep that night, which I did many nights . . . ."

¶ 73   The prosecutor then asked H.K.,

> Q. . . . What happened next that made you decide to disclose to your family?
> A. I just felt like I should've told her the truth as to why I was crying, or why she felt like I needed a blessing, because that night I did need [a] blessing . . . .

H.K. then read the relevant text messages aloud:

> A. [Mother], . . . 'I woke up in the middle of the night and had a strong impression that you needed a blessing. Can you ask [friend] and one of his roommates today?'
>
> Q. Okay. Your response?
> A. . . . I cried myself to sleep last night, Mom.' She said, '[W]hy?' I didn't [respond]—she called me, I didn't answer. [Mother], 'I tried to call you. Please call me.' I said, 'I don't want to talk about it, but it involves Kathleen and Keith.' . . .

¶ 74   The prosecutor later questioned Mother about the same text messages:

> Q. You said [H.K.] was out at college at that time? Okay. Was there something that caused you concern with [her]? . . .
> A. During that semester, I noticed her having maybe some difficulty focusing on her school work, and . . . she'd had pneumonia the first part of December, so she had been sick, and I was concerned about that. But I just kept feeling like there was something else that was weighing on her, something else that was not right.
>
> Q. . . . could you read that [text message], please? . . .
> A. The first text is from me, and it says, 'I woke up in the middle of the night and had a strong impression that you need a blessing. Can you ask [friend] and one of his roommates today?' Because I'd been telling her

she needed a blessing because of the pneumonia. And then—

Q. What was her response?
A. She responded and said, 'I cried myself to sleep last night, Mom'. And I texted her back and said, '[W]hy'? And she didn't answer me for a while. . . . [Then] she texted me back and said, 'I don't want to talk about it, but it involves Kathleen and Keith.'

Mother then testified that a few weeks later when H.K. was home on a break from school, she said to H.K. that "at some point, you need to tell me what it was that upset you so badly that has to do with Keith and Kathleen," which eventually led to the disclosure of the abuse.

¶ 75   Vallejo characterizes this testimony as evidence of Mother's "spiritual manifestation" and contends that its admission violated Utah Rules of Evidence 403 and 610. Vallejo argues that "[t]here is a strong likelihood that Utah County jurors," where the trial occurred, "would consider Mother's feelings about something weighing on HK and her waking with [a] 'strong impression' that HK needed a 'blessing' on a night where HK cried herself to sleep over Keith and Kathleen to be a manifestation from God confirming the veracity of HK's allegations."

¶ 76   Vallejo asserts that the testimony "caused unfair prejudice by allowing jurors to base their decision on their beliefs about divine manifestations rather than established factual propositions of the case," and therefore violated rule 403. Utah Rule of Evidence 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Vallejo also argues that the testimony violated rule 610, which prohibits the admission of "[e]vidence of a witness's religious beliefs or opinions . . . to attack or support the witness's credibility." UTAH R. EVID. 610.[14]

---

[14] Rule 610 of the Utah Rules of Evidence "is the federal rule, verbatim," UTAH R. EVID. 610 advisory committee note, therefore we look to federal cases interpreting the federal rule for guidance. *See Robinson v. Taylor*, 2015 UT 69, ¶ 10, 356 P.3d 1230. And, where a state court has interpreted a rule of evidence determined to be in

(continued . . .)

¶ 77 We do not address whether the religious testimony was properly admitted, because it was reasonable for competent counsel to not object for a variety of reasons. Vallejo's trial counsel could have reasonably decided not to object because he made frequent references to Vallejo's own religion and role as a religious leader. During the opening statement, Vallejo's trial counsel commented that Vallejo "had received his church calling and was his ward's bishop." Vallejo also introduced evidence of his own religious conduct, testifying that he "went on a mission for a couple years" and that later he "was a bishop," which he "loved." He testified that his responsibilities as a bishop took "fifteen to twenty hours of [his] week." Vallejo thus made significant references throughout the trial to his own membership and leadership within the Church of Jesus Christ of Latter-day Saints.[15] Vallejo's counsel therefore could

lockstep with the respective federal rule, we may consider such state cases as well.

Federal and state cases illustrate the narrow scope of rule 610. *See Gov't of the Virgin Islands v. Petersen,* 553 F.2d 324, 328 (3d Cir. 1977) ("[Federal Rule of Evidence] 610[] clearly prohibits such testimony [of religious affiliation and beliefs] when it is used to enhance the witness'[s] credibility . . . ."); *State v. Marvin*, 606 P.2d 406, 409 (Ariz. 1980) ("Appellant complains that testimony concerning his Mormon beliefs was improperly excluded by the trial judge. We do not agree. . . . The testimony concerning religious beliefs was intended to bolster appellant's credibility . . . . [A] witness [may not] seek to enhance his testimony in reliance [on religious beliefs]."). Rule 610 does not prohibit references to religion wholesale, however. *United States v. Davis*, 779 F.3d 1305, 1308–09 (11th Cir. 2015) ("Evidence of religious beliefs or opinions may be admitted for another purpose" than "to attack or support the witness's credibility." (internal quotation marks omitted)); *State v. Stone,* 728 P.2d 674, 677 (Ariz. Ct. App. 1986) ("[I]f such information is probative of something other than veracity, it is not inadmissible simply because it may also involve a religious subject as well."); 28 CHARLES ALAN WRIGHT ET. AL., FEDERAL PRACTICE AND PROCEDURE § 6152 (2d ed. 2018) ("[A] . . . policy assumption underlying [r]ule 610 is compelling for the very reason that many people presume a strong connection between religious belief and moral character; evidence of religious belief or lack thereof may be highly prejudicial.").

[15] Vallejo contends that testimony concerning his work as the bishop of his local congregation was "presented only to show he was

(continued . . .)

reasonably have thought that an objection to the testimony about a spiritual prompting could make it more difficult to argue that he should be permitted to introduce evidence about Vallejo's own church service.

¶ 78 Moreover, to prevail, Vallejo needs to show that reasonably competent trial counsel necessarily would have objected to the testimony. And that means that reasonably competent counsel would have believed that the jury would react to the testimony in the way that Vallejo predicts. Vallejo assumes that there is a "strong likelihood that Utah County jurors" would have considered Mother's intuition to be "a manifestation from God confirming the veracity of HK's allegations." But that is an assumption we are unwilling to make based on the sole fact that the jury was selected from Utah County. Certainly, a juror might draw the conclusion Vallejo fears, and had counsel objected and the judge sustained the objection, we would be hard-pressed to call that an abuse of the district court's discretion. But it is entirely another matter to assume that a member of the jury would inevitably react in the way Vallejo describes such that we would conclude that his trial counsel was deficient for failing to object.

¶ 79 In other words, Vallejo's assumption about how a "Utah County" juror must have responded to the testimony does not convince us that trial counsel's failure to object was the product of deficient performance. After all, trial counsel sat through voir dire and observed the jurors' responses to evidence as it was presented. Counsel was therefore in a much better position to gauge how these particular "Utah County" jurors might respond to this evidence than we are. We are therefore reticent to conclude that Vallejo's counsel had no tactical reason to not object to the testimony and that the provision of objectively reasonable legal representation required an objection.

## II. Attorney-Client Privilege

¶ 80 Vallejo next argues that the admission of Rocky Steele's testimony, in which he attested to statements Vallejo made to him at the farmhouse, was improper because the statements were protected

---

juggling work, school, and church duties." Even if we were to credit that assertion, it does not require much imagination to see that Vallejo might have been hoping for some of the same testimony bolstering that he argues Mother's testimony enjoyed.

by the attorney-client privilege under Utah Rule of Evidence 504(b). At trial, Vallejo bore the burden of establishing that an attorney-client relationship existed, the communication of confidential information, and that the purpose was to obtain legal advice. UTAH R. EVID. 504(b);[16] *S. Utah Wilderness All. v. Automated Geographic Reference Ctr.*, 2008 UT 88, ¶ 33, 200 P.3d 643. The district court concluded that Vallejo did not meet his burden of establishing that the statements were privileged.

¶ 81 The day prior to the farmhouse meeting, Kathleen visited with Steele and his wife and shared with them that she had learned of the allegations. Vallejo and Kathleen discussed the allegations with Steele the next day while they drove to the farmhouse and waited there for Vallejo's Brother—an attorney—to arrive. Steele described that Vallejo talked about "the accusations and the stress of it, and the emotion of it." "Emotions were on the surface, were very raw," Steele described. Vallejo also talked with Steele about "things that had happened that weren't the accusations, but things that . . . happened that weren't appropriate."

¶ 82 Vallejo contends that three statements that he made to Steele at the farmhouse should have been excluded. First, Steele testified that Vallejo said "he would lay on the couch with [H.K. and J.K.], . . . that he would be very close with them physically sometimes . . . on the couch at night." Second, Steel testified that while Vallejo "insinuat[ed]" that he did not engage in the alleged conduct, Vallejo never expressly denied the allegations—"he never said, 'I did not do it.'" And third, Steele testified that Vallejo told him about an instance when J.K. sat on top of Vallejo's foot on the couch. Steele testified that Vallejo told him that he then "started to move his foot in a way to arouse her, to stimulate her" and "that he

---

[16] Under rule 504(b), "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client" are privileged. UTAH R. EVID. 504(b) (2014). Rule 504(b) requires that communications were between "the client and the client's representative and [or] the lawyer[] [or] lawyer's representative," or meet other criteria not relevant here. *Id.* 504(b) (2014).

We quote the version of the rule in effect at the time that the communications were made in 2014, which was the same version in effect at the time that the privilege was asserted in 2017.

was sorry about that, and . . . that it was just dumb. He didn't know why he did it."

¶ 83 The district court made extensive factual findings and conclusions of law. The district court found:

> Defendant picked up Mr. Steele . . . and drove him to [Vallejo's brother's] nearby farmhouse. Kathleen was present. During the drive and after arriving there, Defendant and Kathleen spoke to Mr. Steele about the allegations, about how difficult Christmas had been, about Defendant's and Kathleen's own private discussions on the matter, about Defendant's conversation with the [church leader] where he was told of these allegations, about the emotions they've had since then, and about the effect the allegations are having on their family . . .

> Later, . . . Defendant's brother and a criminal defense attorney [Brother] []arrived. [Brother] wanted to discuss legal strategies with Defendant, so [Brother] asked Kathleen and Mr. Steele to leave the room. They both did, and neither of them heard anything in Defendant's private conversation with [Brother]. . . .

> In the months ensuing the disclosure of the allegations, Defendant continued to discuss things with Mr. Steele. . . . Defendant told Mr. Steele how stressful things were. At one point . . . Defendant suggested that maybe [Brother] and Mr. Steele could represent him. Mr. Steele replied that he was not a practicing attorney and that Defendant needed to hire a criminal defense attorney. This was the first time—in the context of these criminal accusations—that Defendant mentioned anything about Mr. Steele's legal background or suggested anything about Mr. Steele's possible provision of legal services . . . The trial court also found that Vallejo continued to talk to Steele after he had told Vallejo that he could not provide him with any legal assistance, again requested that Steele represent him, and was again told by Steele that he was not a practicing attorney.

¶ 84 The district court then concluded that Vallejo failed to carry his burden of establishing the existence of an attorney-client privilege under rule 504 of the Utah Rules of Evidence. The district court concluded that "[n]o evidence indicates that the[] statements

[made at the farmhouse] were made for the purpose of facilitating Mr. Steele's rendition of professional legal services," as required under rule 504(b)(1). Rather, "all the evidence indicates that, at least until [Brother] arrived, it was a conversation among good friends about a traumatic circumstance in the lives of Defendant and his wife." The district court noted that "Mr. Steele offered no legal advice—ever—and he was never asked for any. He just listened as Defendant and his wife unburdened their cares, worries, and fears." And the district court concluded that "other than testifying that he always thought Mr. Steele was an attorney, Defendant offers no evidence that his farmhouse communications were made for the purpose of facilitating Mr. Steele's rendition of professional legal services to him."

¶ 85   Vallejo largely ignores these factual findings and focuses on Vallejo's characterization of the events. At the hearing, Vallejo testified that the purpose of the farmhouse meeting was "[t]o get counsel" with regard to H.K.'s and J.K.'s allegations and that he sought legal counsel from Steele.

¶ 86   But on cross-examination, Vallejo acknowledged that he knew that Steele was not a criminal defense attorney and stated that he knew "[f]rom the get go" that he was not going to hire Steele as an attorney.

¶ 87   On re-direct, Vallejo's counsel attempted to salvage Vallejo's testimony:

> Q. [At] the meeting where your brother was present, did you seek [Steele] out to give you advice about this case?
> A. Initially, no. I did not want to, but my wife had already gone to him and talked a little bit, and then yes, I did want him—I did want his help.
>
> Q. Okay. And we're talking about at the meeting itself, were you seeking legal advice from him at that time?
> A. Yes. Yes.

In addition, Vallejo gave conflicting testimony as to whether he continued to seek legal counsel from Steele after the farmhouse meeting.[17]

---

[17] At the same hearing, Steele testified about the farmhouse meeting. He testified that he understood the purpose of the meeting

(continued . . .)

¶ 88   In other words, the district court's legal conclusion rests on unchallenged factual findings. Specifically, the district court found that when they met in the farmhouse, Vallejo was not seeking legal advice from Steele. The district court noted that Vallejo had offered "no evidence that his farmhouse communications were made for the purpose of facilitating Mr. Steele's rendition of professional legal services."

¶ 89   Although Vallejo does not couch his argument in terms of a challenge to the district court's factual findings, he does take aim at them, arguing that Vallejo was engaged in "a conversation with a view toward obtaining legal services." But Vallejo has not pointed us to evidence that would cause us to second-guess the district court's finding that Vallejo was unburdening his soul to a friend, and that he was not looking to Steele for legal advice. The most compelling testimony pointing the other direction is Vallejo's own assertion that he sought legal advice from Steele. But, in light of the other evidence in front of the district court, and Vallejo's concession on cross-examination that he was not looking to retain Steele, we are unwilling to say that the district court's factual findings were clearly erroneous or that the court otherwise erred in concluding that Vallejo failed to establish the existence of a privilege.

III. Prejudicial Effect of the Use of the Word "Victim"

¶ 90   Finally, Vallejo raises several claims based on a handful of references to H.K. and J.K. as a "victim" or "victims" during trial. Vallejo argues that "[w]ithout the inappropriate references to HK and JK as victims, it is reasonably likely the outcome of the trial would have been different." And Vallejo views these inappropriate references as more problematic because the word "victim" was also used throughout the trial to refer generally to individuals that are dealing with or disclosing sexual abuse.

---

was for Vallejo, who he described as "one of my best friends," to "just talk to me and tell me, this was what's going on." Steele testified that there was no discussion at that meeting of him providing legal representation to Vallejo. Specifically, Steele stated that Vallejo never said anything about a legal strategy in their conversation, and that the only discussion of legal strategy came from Vallejo's Brother—the criminal defense attorney—at the end of the meeting.

¶ 91   On the second day of trial, Vallejo's trial counsel objected to a question the State posed to H.K. on direct examination. During the discussion that ensued over the admissibility of the testimony, the judge stated, "it sounds like it's just contextual for how the victim responded, so overruled." Vallejo's trial counsel then asked for the jury to be excused from the room and moved for a mistrial. Vallejo's counsel asked for a mistrial because the "[c]ourt looked at the witness just now and referred to her . . . as the victim." The court denied the motion for a mistrial noting that the court believed the "jury [didn't] pick[] up on" the comment. The court gave a curative instruction based on the model jury instruction regarding the judge's neutrality.

¶ 92   Later in the trial, a police officer used the term "victim" or "victims" three times while testifying. First, the police officer engaged in the following exchange on direct examination:

> Q. What initial information did you obtain about [the Vallejo] case when it was assigned?
> A. The initial information was that two sisters had been molested by Keith Vallejo.
>
> Q. Okay. How did you proceed with your investigation at that point?
> A. Because it was a third-party report, I was waiting until I received the initial reporting information from the actual victims.

¶ 93   The prosecutor then asked questions about the typical collection of sexual assault evidence. The officer explained that if an individual reports a sexual assault within a limited timeframe, a clinic will "collect evidence from the victim of the crime that's reporting this."

¶ 94   Later, the prosecutor asked questions about the typical use of a sexual assault evidence collection kit and why he did not use one in his investigation. The officer stated,

> A. Because by the time I had this reported to me . . . I would not expect in that case to get any kind of evidence from anybody, whether it be the suspect or the victim in that typical case like that . . . .

¶ 95   At that point, Vallejo's counsel objected and stated, "That's the third time that [the officer has] used the word victim in referring to [H.K.] and [J.K.]." The district court responded that he did not "hear [the officer] talking about [H.K.] and [J.K.] that way." Vallejo's counsel conceded that the second and third references were more

general but that the first reference was to H.K. and J.K. directly. The prosecutor agreed to instruct the officer to not use the term victim.

¶ 96   Earlier that day, the State's expert witness—a clinical social worker—used the term "victim" three times while testifying about misconceptions about sexual abuse before Vallejo's counsel asked for her to use different language. While explaining general misconceptions about individuals who have been sexually assaulted, the expert witness stated that there is often a belief that "a victim will go right in and report what happened to them," and "that a victim will fight in a situation where they're being sexually assaulted." The expert also stated that as a "rape crisis coordinator, one of the things we did [wa]s [go] to the hospital right when a victim reported."

¶ 97   At that point, the State requested a sidebar to address the issue that the expert witness referred to her "patients as victims." Vallejo's counsel asked for the expert to use "clients or patients" instead and the court and prosecutor agreed. After the sidebar, the expert used the word "victim" six more times, although she usually corrected herself.

¶ 98     Vallejo argues that the district court erred in denying the motion for mistrial. As noted above, "[w]e will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion." *State v. Cardall*, 1999 UT 51, ¶ 19, 982 P.2d 79 (citation omitted). "[U]nless a review of the record shows . . . that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Id.* (alterations in original) (citation omitted).

¶ 99 Vallejo's motion for mistrial was based on the court's apparently inadvertent use of the word "victim" to refer to H.K. While improper statements made by the court are serious, the court gave a curative instruction and crafted it so as to attempt to not further bring the jury's attention to his improper comment.[18]

---

[18] We agree with Vallejo that curative instructions are not a "cure-all." *See State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (plurality opinion). And we take seriously any remark or conduct that a judge may make that could give a jury an impression of partiality. But here, given the inadvertent and solitary incident of the judge's use of "victim" to refer to H.K., we conclude that the curative instruction was sufficient, especially because the judge gave a general curative

(continued . . .)

¶ 100   We agree that the judge's remark was ill-advised and unfortunate. But given the context of the single statement and the judge's efforts to correct it, the district court did not abuse its discretion by denying the motion for a new trial.

¶ 101   Vallejo next argues that his counsel was ineffective for failing to continue to object to the officer's and expert's use of the word "victim." Vallejo states that "[t]o the extent counsel should have objected sooner or more frequently, counsel was ineffective. Counsel was aware of the error and had made a previous motion for mistrial. Thus, no conceivable strategy supports failure to object each time the reference was made . . . ." In his reply brief, Vallejo phrases this as "counsel was ineffective for failing to immediately object and make another motion for mistrial when [the police officer] referred to HK and JK as 'victims.'"

¶ 102   We again recognize the gravity of referring to witnesses as victims during a trial. And we will assume, without deciding, that counsel's failure to object resulted in ineffective assistance. This requires us to focus our inquiry on whether this prejudiced Vallejo. Under *Strickland,* Vallejo must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 103   As described above, the police officer made one reference to H.K. and J.K. as victims. This happened when he explained that "[he] wait[ed] until [he] received the initial reporting information from the actual victims" before investigating the Vallejo case. His other use of the term referred to victims in general and not to H.K. or J.K. specifically. The expert similarly spoke in terms of her

---

instruction to avoid drawing further attention to the improper comment.

We heed the critiques that Justice Durham thoughtfully leveled at curative instructions. *See id.* at 277–79 (Durham, J., concurring). And we should be careful before concluding that a curative instruction undid the harm that could potentially flow from a judge seeming to comment on the merits of a matter. With that caveat well in mind, here the curative instruction did not reinforce the judge's mistake, and the judge's comment was isolated and fleeting. Taken together, we are convinced that the comment did not taint the proceeding and does not demand a mistrial.

generalized experience working with victims of sexual assault. So it is unlikely that the jury would have understood the expert to be opining that H.K. and J.K. were victims.

¶ 104   Vallejo argues that the references "implied that the jury should consider HK and JK to be victims because they had made allegations against [Vallejo]." And he asserts that the stakes were high because the "case hinged on credibility." "The impermissible references to HK and JK as victims went to the ultimate issue and unfairly and improperly bolstered their credibility." We understand his concerns. But we cannot agree with Vallejo's conclusion that "[w]ithout the inappropriate references to HK and JK as victims, it is reasonably likely the outcome of the trial would have been different."

¶ 105   The jury heard extensive and detailed testimony from J.K. and H.K. about the abuse. The jury heard testimony from J.J. about H.K.'s disclosure of the abuse the day after Vallejo digitally penetrated her vagina. An expert witness testified about common reactions of individuals that experience sexual abuse—including reasons for delayed disclosure—which provided context for H.K.'s and J.K.'s behavior. And Vallejo's own friend, Rocky Steele, testified to statements Vallejo had made to him about laying on the couch closely with H.K. and J.K. at night and that Vallejo once "move[d] his foot in a way to arouse [J.K.], to stimulate her" when she sat on his foot.

¶ 106   Given this evidence, we conclude that the reference to H.K. and J.K. as victims—and the other references to victims generally—did not prejudice Vallejo.[19]

## CONCLUSION

¶ 107   Vallejo has failed to demonstrate that his trial counsel's actions fell below an objective standard of reasonableness with regard to the failure to move to sever the charges as well as failure to

---

[19] Vallejo also argues that the references to H.K. and J.K. as victims prejudiced him by violating his "constitutional right to the presumption of innocence." *See, e.g., State v. Devey*, 2006 UT App 219, ¶¶ 9, 17, 19, 138 P.3d 90. Vallejo contends that the district court's statement, along with those from the officer and the expert, prejudiced his ability to receive a fair trial. For the reasons articulated above, we are unconvinced that these references impacted the jury's verdict.

object to the testimony in question provided by J.J., H.K., and Mother. We conclude that Vallejo did not demonstrate that the district court erred in finding that he did not seek legal advice from Steele and using that finding to conclude that no attorney-client privilege attached to their conversation. We also conclude that the district court's denial of Vallejo's motion for mistrial was not an abuse of the district court's discretion and that Vallejo did not suffer prejudice from the references to H.K. and J.K. as "victims." We affirm Vallejo's convictions.

———————