**2021 UT App 53**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OSCAR EDUARDO GODINEZ JUAREZ,
Appellant.

Opinion
No. 20190123-CA
Filed May 20, 2021

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 161909011

Brett J. DelPorto, Attorney for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE JILL M. POHLMAN and SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1　A jury convicted Oscar Eduardo Godinez Juarez of aggravated kidnapping, aggravated robbery, and aggravated assault. Godinez Juarez[2] appeals those convictions, asserting that

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

2. Before the trial court, the attorneys, various witnesses, and the court referred to the defendant as either "Mr. Godinez" or "Mr. Godinez Juarez." Yet in his briefing on appeal, the defendant is referred to simply as "Juarez." These discrepancies likely arise from the differences between naming conventions used by

(continued…)

his trial attorney rendered constitutionally ineffective assistance by agreeing to a "dual-jury" trial procedure, and asserting that the trial court erred in denying his motion for mistrial related to the prosecutor's and witnesses' use of the term "victims" in referring to the complaining witnesses. We reject Godinez Juarez's arguments and affirm his convictions.

BACKGROUND[3]

¶2     One evening, two seventeen-year-old boys (collectively, Teens; individually, Teen 1 and Teen 2) went to Godinez Juarez's house—a place they had been "once or twice" before—to "hang out." When they arrived, Godinez Juarez was not home, but Teens were greeted by another acquaintance (Codefendant), with whom they socialized while waiting for Godinez Juarez. When Godinez Juarez got home, he immediately confronted Teen 1, "calling him a snitch," and pointed a handgun "right in

---

(…continued)

individuals of non-Spanish European descent—who often "have a first name, an optional middle name, and a single last name inherited solely from the father"—and individuals of Hispanic descent—who often "have two given names, plus a paternal surname . . . and a maternal surname." *See Naming customs of Hispanic America*, Wikipedia, https://en.wikipedia.org/wiki/Naming_customs_of_Hispanic_America [https://perma.cc/R9JQ-N5S7]. To avoid confusion and to recognize the defendant's paternal and maternal surnames, in this opinion we refer to him as "Godinez Juarez."

3. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *Noor v. State*, 2019 UT 3, n.1, 435 P.3d 221 (quotation simplified).

[Teen 1's] face." Teen 1 first thought Godinez Juarez was joking and pushed the gun away, but Godinez Juarez continued to threaten Teen 1. Teen 2 attempted to intervene, but Codefendant quickly "smacked" him, took away his cell phone, and produced a rifle. While pointing the guns at Teens, Godinez Juarez and Codefendant threatened to "smoke" them, and commanded them to go downstairs into the basement.

¶3     Once they were downstairs, Godinez Juarez ordered Teens to empty their pockets and "to get on [their] knees"; he then struck Teen 2 on the head with the handgun, and he and Codefendant began kicking Teens "everywhere on [their] bodies." After a while, Godinez Juarez and Codefendant left the room and when they returned, Codefendant was holding some "weed eater string" and Godinez Juarez had a "Fiji" brand plastic water bottle that contained gasoline. Codefendant tied up Teens with the weed eater string and Godinez Juarez poured the gasoline onto both Teens. While pouring gasoline onto Teen 2, Godinez Juarez pressed his foot to Teen 2's face, causing him to ingest some of the gasoline. Godinez Juarez then sprayed a different substance—that Teens at first thought was "brake fluid" but turned out to be "starter fluid"—into Teens' ears. After dousing Teens in flammable liquid, Codefendant held a lit "blunt"[4] over Teen 1 and repeatedly brought it close to his body as "if he was going to let it go." Godinez Juarez and Codefendant also picked up a chainsaw in an effort to further torment Teens, but were unable to get it started.

¶4     Throughout the basement ordeal, Godinez Juarez and Codefendant were intermittently laughing and repeatedly

---

4. "A blunt is a street term used to describe a cigar that has been hollowed out, filled with marijuana, and smoked to ingest the drug." *Robert S. v. Commissioner of Corr.*, 221 A.3d 493, 499 n.4 (Conn. App. Ct. 2019) (quotation simplified).

threatening to kill Teens, suggesting more than once that they were going to "take [them] somewhere," "cut [them] up," and bury them. After "stomping and kicking" Teens some more, Godinez Juarez and Codefendant told them to move into the garage. In the process of getting up off the basement floor, Teen 1 was able to grab his cell phone, which Codefendant had confiscated but left nearby, and conceal it in his waistband. Once in the garage, Godinez Juarez and Codefendant forced Teens to "roll over" and "lick the floor," which was covered in dog feces. After a few minutes, Godinez Juarez and Codefendant left the room, and Teen 1 was able to pull the cell phone out of his waistband and dial 911. Once the operator answered, Teen 1 began to tell her about the situation, but Godinez Juarez returned and Teen 1 had to hang up the phone.

¶5 On the other end of Teen 1's 911 call, the operator at first could not hear anything aside from "a lot of ruffling and some talking," but eventually was able to hear someone exclaim, "[T]hey're going to kill me." Based on what the operator and dispatcher could glean from the call, they informed the responding officers that the caller was being held in a garage, but were not able to give an exact address. As the phone call continued, the operator was able to triangulate a general GPS location based on the cell signal and updated the dispatcher with an approximate address. One of the responding officers (Officer) was travelling toward the approximate location given by the dispatcher when he came across Godinez Juarez in an alleyway. Officer identified himself as a police officer, prompting Godinez Juarez to attempt to retreat. After Officer "grabbed ahold of him," Godinez Juarez looked in the direction of his house and yelled, "Shut the garage, shut the garage." At that point, Officer looked toward the garage and saw that it was partially open, but did not immediately notice anything out of the ordinary. A few moments later, however, the garage "opened all the way" and Teen 1 ran out, shouting expletives and exclaiming, "[T]hese guys are trying to kill us."

¶6     Shortly thereafter, Teen 2 was able to partially free himself and make his way out of the garage. After Teens had exited the garage, and with Godinez Juarez in custody, Officer used a bullhorn to command any other individuals to come out based on the belief "that there was possibly another person in the house, and that that person was probably armed and dangerous." After a few minutes, Codefendant exited the house without further incident and was detained by police.

¶7     "[A]fter the residence was cleared," officers searched the house pursuant to a search warrant. During the search, officers recovered evidence indicating that Godinez Juarez lived at the house, including mail addressed to him, his student ID, and his passport. The officers also found evidence that substantiated many of the details given in Teens' account of events, including a "Fiji water bottle that contained a yellow-like substance," a can of "starter fluid," a chainsaw, and a handgun and rifle hidden in a ventilation grate. Finally, at least one responding officer observed the condition of the garage, noting that he "could smell the dog feces and urine" as soon as the garage door opened, and described how "it was everywhere."

¶8     Later that night, officers interviewed Godinez Juarez at the police station. In the interview, Godinez Juarez admitted that he lived in the house where Teens were found and that Teens had been there multiple times before. Godinez Juarez also stated that he believed Teens "were snitching on him," and that "he wanted to teach them a lesson" that night. He admitted to binding Teens' legs with "weed whacker wire," and pouring "clear liquid [on them] from a Fiji bottle," although he claimed that he did not realize the liquid was gasoline until he smelled the fumes as he was pouring it. During the interview, Godinez Juarez exhibited a "proud" demeanor, admitting that he "slapped [Teens] around" and simultaneously demonstrating a slapping motion while laughing.

¶9 That same night, officers also interviewed Codefendant. He was interviewed in a separate room from Godinez Juarez, and they could not hear each other. During the course of the interview, Codefendant at first denied any wrongdoing, but eventually "admitted to tying [Teens] up" with "weed eater cord" based on the belief that "one of [them] was a snitch." Codefendant also admitted to "handling the rifle," and told officers where they could find the guns in Godinez Juarez's house. Codefendant also told officers that Teens were not his friends and "they didn't like [him] and [he] didn't like them."

¶10 The State charged Godinez Juarez with two counts each of aggravated kidnapping and aggravated robbery, all first-degree felonies, and two counts of third-degree-felony aggravated assault.[5] The State filed similar charges against Codefendant.

¶11 As the case proceeded toward trial, Godinez Juarez filed a motion to sever his trial from Codefendant's. In response, the State filed a motion asking the trial court to employ a "dual jury procedure" to resolve the apparent "*Bruton* problem"[6] posed by the State's intention to offer both defendants' confessions into evidence at trial. Rather than conduct two entirely separate trials, the State proposed that just one trial be held, but that the court empanel two separate juries—one specific to each

---

5. Godinez Juarez was also charged with several drug-related offenses, but the State later voluntarily dismissed these charges with prejudice.

6. *See generally Bruton v. United States*, 391 U.S. 123 (1968) (holding that, in a criminal trial with two defendants, a codefendant's out-of-court statement implicating the defendant's guilt cannot be offered against the defendant because it violates the defendant's Sixth Amendment right to confront and cross-examine witnesses).

defendant—and ask each defendant's respective jury to leave the courtroom when a codefendant's out-of-court statement (or other evidence admissible as to only one defendant) was presented. In this way, each defendant's confession would be heard only by that defendant's jury. The State asserted in its motion that a dual-jury trial would serve judicial economy and would require the witnesses—including Teens in particular—to testify at only one trial rather than two. Eventually, through his trial counsel (Trial Counsel), Godinez Juarez agreed to this procedure and indicated that he did "not object to the State's request for dual juries."

¶12 The trial court presided over a five-day jury trial, for which it empaneled two separate juries. To ensure easy identification of the jurors, the court required members of Godinez Juarez's jury to wear blue lanyards, and required members of Codefendant's jury to wear black lanyards. The court also provided several instructions to ensure that the jurors understood that their role was specific to adjudging their respective defendant's guilt, and not that of the other defendant.

¶13 On the second day of trial, Teen 2 testified extensively as to the events outlined above. During the third day of trial, the State presented testimony from Teen 1, but he indicated that he could not remember the incident after two years, and stated that he "blacked out." The prosecutor then attempted to refresh his recollection by presenting him with the police report from that night, when the following exchange occurred:

> Prosecutor: When you've had a chance to look at that report, does that refresh your recollection as to whether you told the police . . . that [Godinez Juarez] had accused you of being a snitch?
>
> Teen 1: Yeah, somewhat.

> Prosecutor: Well—okay. Do you remember [Godinez Juarez] telling you, you were a snitch?
>
> Teen 1: I don't remember exactly who said what, but it was something about . . . being a snitch between me and another victim.
>
> Prosecutor: Okay. And who's the other victim?
>
> Teen 1: You said his name was—

At that point, Trial Counsel asked to approach the bench and lodged an objection, asserting, "I don't want to object before the jury just to bring more attention to it, but I don't think it's proper for the . . . witness [to say] victim, and I don't think it's proper for the [prosecutor] to say—use the word 'victim.'" The prosecutor agreed, and indicated he would refrain from referring to Teens as "victims."

¶14　The State also presented testimony from several officers and detectives, who testified about the actions they took upon arriving at the scene. In this context, one officer stated, "I walked over there because that was where I was directed where the victims were." Trial Counsel objected a few minutes later during a sidebar conference, stating that the officer-witness had "used the term 'victim' again. I would just ask the State . . . to inform all of the witnesses before they call them not to use that term." The court observed that the State was already "aware of that." Later that day, a different officer—a detective—was testifying about his post-incident interview with Teen 1 and, in describing where the interview took place, referred to the location as "one of our victim interview rooms." And during cross-examination, the detective referred to being in that room with "the victim."

¶15   This last reference prompted Trial Counsel to "move for a mistrial on the repeated use of the word 'victim' by the State[]" when referring to Teens. After making the motion, Trial Counsel recounted each instance in which the word "victim" had been used. Trial Counsel asserted that this constituted a "repeated pattern" on the part of the State after there "was a very clear directive from [the court] to the State to inform all of its witnesses not to use that term." Trial Counsel further argued that repeatedly "calling people who are not legally established as victims through a jury verdict as victims . . . invit[ed] prejudice to the right to [a] fair trial for both defendants," and that a curative instruction would "bring[] more attention to the issue than is necessary." The trial court disagreed, opining that the specific uses of the word "victim," viewed in context, had been inadvertent and not prejudicial. The court denied the motion for mistrial, but offered to give the jury a curative instruction if Trial Counsel requested one. Trial Counsel later agreed to a set of jury instructions that included such an instruction and, after the close of evidence, in connection with giving other instructions, the court instructed the jury that "[c]ertain witnesses have referred to [Teens] as victims in this case. This was done in error. It is up to you, and you alone, to determine beyond a reasonable doubt whether the crimes have been committed in this case."

¶16   Also during the third day of trial—the final day of the State's case-in-chief—the State offered testimony from a detective who served as the case manager for everyone investigating Codefendant's case (Case Manager). During direct examination, Case Manager testified about his participation in the search of Godinez Juarez's house, the recovery of several pieces of evidence, photographs of the evidence and certain parts of the house, and the chain of custody over that evidence. Both juries were present for the State's direct examination of Case Manager. At the conclusion of the State's direct examination, the court excused both juries for a short break, but after the break invited only Codefendant's jury—and not

Godinez Juarez's jury—back to the courtroom to hear cross-examination of Case Manager by Codefendant's counsel. While cross-examining Case Manager, Codefendant's counsel asked a series of questions designed to cast more of the blame on Godinez Juarez than on Codefendant. For instance, Case Manager offered his view that Codefendant was only a "short term" visitor at the house, that the house appeared to be Godinez Juarez's residence, and that police had no reason to believe that many of the items discovered during the search of the house belonged to Codefendant. Following the cross-examination by Codefendant's counsel, the State chose not to conduct a redirect examination, the court informed Codefendant's jury that the State had rested its case against Codefendant, and Codefendant's jury was excused for the day. Trial Counsel then indicated that he was not going to cross-examine Case Manager with respect to Godinez Juarez's case. Godinez Juarez's jury then returned to the courtroom, and Case Manager was excused from the witness stand. Thus, Godinez Juarez's jury was not present for any testimony offered by Case Manager on cross-examination.

¶17    After calling one more witness to testify against Godinez Juarez, the State rested its case against him. On the afternoon of the trial's third day, Godinez Juarez presented his case-in-chief, during which he called one witness, but elected not to testify in his own defense. At the end of the day, after Godinez Juarez rested his case, the court informed Godinez Juarez's jury that it would be excused for the entire fourth day of trial, because that day would exclusively involve "matters [for] the other jury."

¶18    On the fourth trial day, outside the presence of Godinez Juarez's jury, Codefendant presented his case-in-chief and testified in his own defense. In his testimony, Codefendant admitted to his own involvement by describing how he threatened Teens with the rifle, but emphasized that Godinez Juarez was the primary perpetrator and suggested that he was

an unwilling participant and was himself intimidated by Godinez Juarez. Codefendant also testified about his confession during his police station interview, describing how he had at first denied any wrongdoing, but "[e]ventually . . . ended up telling [police] that [he] was the one that tied [Teens] up and [told police] where they could find the guns." After Codefendant rested his case, the State called, as a rebuttal witness, one of the detectives who interviewed Codefendant; that detective gave additional testimony about Codefendant's confession. But as noted, Godinez Juarez's jury did not hear any of this testimony—neither Codefendant's in-court testimony nor any testimony about his confession the night of the crime—because it was not present during the entire fourth day of trial.

¶19    Also during the fourth trial day, after Codefendant had rested his case, the court heard argument—outside the presence of either jury—regarding finalization of the jury instructions for the two cases. During this discussion, Trial Counsel objected to a proposed instruction "suggest[ing] that if a jury finds the evidence proof beyond a reasonable doubt, they *must* convict." (Emphasis added.) Trial Counsel characterized his objection as "[e]ssentially a jury nullification argument," and asserted that "both the Utah Constitution and the Federal Constitution, when they were adopted, contemplated the ability of a jury to reject charges simply because they disagreed with them." In particular, Trial Counsel asked the court to change the language of the relevant instruction from "must" to "may." Trial Counsel's sole argument in this regard was constitutional; he made no statutory argument and cited no case law; indeed, he acknowledged that "the weight of the case law [wa]s against" his argument. The trial court overruled the objection.

¶20    At the conclusion of the trial, Godinez Juarez's jury returned a guilty verdict on all counts, and the trial court later sentenced Godinez Juarez to prison.

ISSUES AND STANDARDS OF REVIEW

¶21 Godinez Juarez now appeals, raising two principal issues for our review. First, he asserts that Trial Counsel rendered ineffective assistance by agreeing to the dual-jury trial procedure. An ineffective assistance of counsel claim "raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (quotation simplified).

¶22 Second, he challenges the trial court's decision to deny his motion for mistrial related to the prosecutor's and certain witnesses' use of the term "victim." The "denial of a motion for mistrial" is reviewed "under an abuse of discretion standard." *State v. Vallejo*, 2019 UT 38, ¶ 35, 449 P.3d 39.[7]

---

7. In addition to the two principal issues addressed herein, Godinez Juarez also argues that the trial court erred by denying his request for a jury instruction that would have advised jurors that they had the ability to acquit even if the State had proved its case beyond a reasonable doubt. Such an instruction is forbidden by statute in Utah, as jurors "are bound to follow the law as stated by the court." Utah Code Ann. § 77-17-10(2) (LexisNexis 2019). And statutes are binding on courts unless proven to be unconstitutional. *Cf. Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1987) ("If Congress intended to reach the issue before the district court, and if it enacted its intention into law in a manner that abides with the Constitution, that is the end of the matter; federal courts are bound to apply rules enacted by Congress with respect to matters over which it has legislative power." (quotation simplified)). Although Godinez Juarez made a constitutional argument to the trial court, he makes no such argument here, and does not otherwise explain why the governing statute should not control. Under these

(continued…)

ANALYSIS

I

¶23   "Defendants charged together with committing the same offense are generally tried together," but "[s]eparate trials may be required when one defendant's incriminating out-of-court statements" would be offered in evidence at trial, and those statements are "admissible against the declarant but not against other codefendants." Elizabeth Williams, Annotation, *Propriety of Use of Multiple Juries at Joint Trial of Multiple Defendants in Federal Criminal Prosecution*, 40 A.L.R. Fed. 3d Art. 4, § 2 (2019). This is because of the United States Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123 (1968), in which the Court held that, in a joint trial, admission of a codefendant's out-of-court statements that tend to incriminate the other defendant violate the other defendant's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment" because the codefendant cannot be cross-examined without violating the codefendant's Fifth Amendment right against compelled self-incrimination. *Id.* at 126–27. One potential solution to the quandary posed by *Bruton* is holding a joint trial with multiple juries, one for each defendant. *See* 40 A.L.R. Fed. 3d Art. 4, § 2. "In such cases, both or all of the juries generally hear all of the evidence, but the jury determining one codefendant's guilt is not permitted to hear the statement introduced against another

_____

(…continued)

circumstances, Godinez Juarez has not carried his appellate burden of persuasion on this issue, and we decline to address it further. *See Kendall v. Olsen*, 2017 UT 38, ¶¶ 9, 15, 424 P.3d 12 (affirming "on the basis of [the appellant]'s failure to carry his burden of persuasion on appeal," without necessarily reaching the merits of the underlying issue).

codefendant if it would not be admissible against the first codefendant." *Id.*

¶24 In this case, the State asked the trial court to employ a dual-jury trial procedure in trying Godinez Juarez and Codefendant, and Trial Counsel eventually stipulated to that request. Godinez Juarez argues that Trial Counsel rendered constitutionally ineffective assistance by acquiescing to the State's dual-jury proposal.

¶25 "Ineffective assistance of counsel claims arise under the Sixth Amendment to the United States Constitution, and we evaluate them under the standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984)." *State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350 (quotation simplified). Under *Strickland*, to establish that Trial Counsel was constitutionally ineffective, Godinez Juarez must satisfy two elements: (1) that "counsel's performance was deficient," and (2) that this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694. "A reasonable probability is a probability sufficient to undermine [our] confidence in the outcome." *See id.* at 694; *accord Scott*, 2020 UT 13, ¶ 43.

¶26 "In practice," however, "we often skip the question of deficient performance when a defendant cannot show prejudice." *State v. Roberts*, 2019 UT App 9, ¶ 23, 438 P.3d 885; *accord Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."). This is because a defendant asserting an ineffective assistance of counsel claim "must make a sufficient showing on both parts of this test in order to establish that counsel provided ineffective assistance," and therefore "it is unnecessary to address both components of the inquiry if we determine that [the defendant] has made an

insufficient showing on one." *See State v. Delgado*, 2020 UT App 121, ¶ 25, 473 P.3d 234 (quotation simplified).

¶27    In this instance, to demonstrate prejudice Godinez Juarez must persuade us that there exists a "reasonable probability" that the result of his case "would have been different" had he been tried through a standard jury trial, severed from Codefendant's, rather than through the dual-jury trial employed here. *See Strickland*, 466 U.S. at 694. To satisfy this part of *Strickland*'s test, Godinez Juarez must show particularized prejudice in his specific case; allegations of structural prejudice, or prejudice per se, are generally insufficient in the context of an ineffective assistance claim. *See State v. Garcia*, 2017 UT 53, ¶ 36, 424 P.3d 171 (stating that nearly all claims for ineffective assistance "are subject to a general requirement that the defendant affirmatively prove prejudice," and that the United States Supreme Court "has even been hesitant to forgo the prejudice analysis where the ineffective assistance resulted in a 'structural error'" (quotation simplified)). And because we agree with the State's position that Godinez Juarez cannot demonstrate prejudice under the *Strickland* test, we proceed directly to that part of the test, without fully addressing deficient performance.[8]

---

8. Although we do not reach the merits of Godinez Juarez's argument that Trial Counsel performed deficiently by agreeing to a dual-jury trial, we recognize the strength of the State's argument that a trial attorney's choice to seek (or stipulate to) a dual-jury trial will, in many cases, constitute the sort of strategic decision that we are loath to second-guess in the context of an ineffective assistance claim. *See State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance."); *see also State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993) (stating that "trial

(continued…)

¶28    In attempting to demonstrate prejudice, Godinez Juarez makes two arguments. First, he complains that the dual-jury procedure was inefficient, and took longer than a single-jury trial would have taken, because of the additional logistics of moving juries in and out of the courtroom, and because of occasional instances of testimony having to be repeated for each jury. But as

---

(…continued)

tactics and strategies" are "within the prerogative of counsel and are generally left to counsel's professional judgment"). We acknowledge that some state courts have been critical of multiple-jury trials. *See, e.g.*, *State v. Corsi*, 430 A.2d 210, 213 (N.J. 1981) ("[T]he multiple jury procedure . . . can involve substantial risks of prejudice to a defendant's right to a fair trial. . . . [T]here are too many opportunities for reversible error to take place. We do not recommend it. If it is to be used at all, it should be in relatively uncomplicated situations which will not require the excessive moving of juries in and out of the courtroom and where physical separation of the juries during the entire trial proceedings can be insured."). But every federal circuit to consider the matter has ruled dual-jury trials acceptable and constitutional, *see* Elizabeth Williams, Annotation, *Propriety of Use of Multiple Juries at Joint Trial of Multiple Defendants in Federal Criminal Prosecution*, 40 A.L.R. Fed. 3d Art. 4, § 2 & n.17 (2019) (collecting cases), and they have been recognized as a viable option by the American Bar Association, *see* Am. Bar Ass'n, *Principles for Juries and Jury Trials* § 13(J) (2016), https://www.americanbar.org/content/dam/aba/administrative/american_jury/2016_jury_principles.pdf [https://perma.cc/HP5T-V3DY]. Without making any pronouncement about how we would review a trial court's contested decision to impose a dual-jury trial procedure over a defendant's objection, we simply note that it may be reasonable for attorneys to ask for (or stipulate to) dual-jury trials in individual cases, and where that is the case, deficient performance is not present.

the State notes, this argument misses the point: even if Godinez Juarez's assertion about inefficiency is true, at best it demonstrates that *the same result* could have been achieved more quickly through a single-jury trial, not that the "result of the proceeding would have been *different*." *See Strickland*, 466 U.S. at 694 (emphasis added).

¶29     Second, Godinez Juarez asserts that he was prejudiced by certain testimony presented at trial. But the only specific testimony he identifies in support of this argument is testimony offered by Case Manager during cross-examination. Godinez Juarez asserts that, through this testimony, Codefendant "blamed [Godinez] Juarez for the drugs police seized because they were discovered at [Godinez] Juarez's home," and notes that Codefendant "pointed to [Godinez] Juarez as the person who poured gasoline on [Teens] because [Codefendant's] fingerprints were not on the water bottle containing gasoline." But as noted, *supra* ¶ 16, Godinez Juarez's jury was not in the courtroom to hear Codefendant's counsel cross-examine Case Manager, and therefore that testimony could not have affected the result in Godinez Juarez's case.

¶30     Indeed, our review of the record indicates that the trial court took great care to make sure neither jury heard evidence that was not meant for its consideration. The juries wore different colored lanyards for easy identification and separation. Furthermore, the court ensured that each jury left the courtroom whenever examination of a witness might potentially present a *Bruton* issue; indeed, Godinez Juarez acknowledges that "cross-examination almost always had to be conducted separately before each defendant's respective jury." In particular, the court excused Godinez Juarez's jury from the courtroom for the entire fourth day of trial, when Codefendant testified.

¶31     Finally, our review of the record also indicates that the evidence against Godinez Juarez—that any jury, even in a single-

jury scenario, would have heard—was convincing: strong evidence indicated that Godinez Juarez lived at the house where Teens were found; both Teens implicated Godinez Juarez in police interviews (although at trial Teen 1 claimed not to be able to recall certain events); Teen 2's trial testimony strongly implicated Godinez Juarez; several pieces of physical evidence found in the house corroborated Teens' narrative; and, perhaps most significant, Godinez Juarez confessed to police that he "slapped [Teens] around," bound their legs with "weed whacker wire," and poured "clear liquid [onto them] from a Fiji bottle."

¶32    In short, Godinez Juarez has not undermined our confidence in the result of his trial. *See Strickland*, 466 U.S. at 694; *Scott*, 2020 UT 13, ¶ 43. Under these circumstances, Godinez Juarez has fallen far short of persuading us that there exists a reasonable probability that the outcome of his trial would have been different if the trial had been conducted in a more traditional single-jury format. Because Godinez Juarez has not shown prejudice, he cannot demonstrate that Trial Counsel rendered constitutionally ineffective assistance, and we reject his claim on that basis.

II

¶33    Godinez Juarez next asserts that the trial court abused its discretion by denying his mistrial motion based on four uses of the word "victim" by witnesses and one follow-up reference by the prosecutor. Although the court denied the motion, it offered to give a curative instruction, and Godinez Juarez later agreed to a set of jury instructions that included a curative instruction. An appellate court "will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion." *State v. Vallejo*, 2019 UT 38, ¶ 98, 449 P.3d 39 (quotation simplified). And we will find an abuse of discretion in this context only if our "review of the record shows that the incident so likely influenced the jury that

the defendant cannot be said to have had a fair trial." *Id.* (quotation simplified).

¶34 Our supreme court has "recognize[d] the gravity of referring to witnesses as victims during a trial." *See id.* ¶ 102. We of course share this view. But as we explain below, the level of judicial concern over the use of the term "victim" during trial depends on the circumstances of the particular case at issue, including the nature of the defendant's defense to the charges, and the context of the individual uses of the term "victim."

¶35 First, if it is clear from the undisputed facts—an analysis partly driven by the defendant's defense to the charges—that the complaining witness was in fact the victim of a crime, our concern with the use of the term "victim" during trial is generally low. Take, for instance, a situation in which a complaining witness was undoubtedly assaulted, as evidenced by obvious physical injuries, and the defendant defends the case not on the ground that no assault occurred but, instead, on the ground that he or she was not the assailant. In such a scenario, there is often no dispute that the complaining witness was the victim of a crime; the only question presented for the jury's consideration is whether the defendant is the one who committed that crime. Under such circumstances, use of the term "victim" usually will be appropriate, even during trial before the jury has reached a verdict. *See Jackson v. State*, 600 A.2d 21, 24 (Del. 1991) (noting that "[t]he term 'victim' is used appropriately during trial when there is no doubt that a crime was committed and simply the identity of the perpetrator is in issue"), *cited with approval in State v. Devey*, 2006 UT App 219, ¶ 17, 138 P.3d 90. On the other hand, use of the term "victim" usually will be inappropriate when the defendant defends the case on grounds that no crime was committed and, concomitantly, that there is no victim in the case at all. *See Devey*, 2006 UT App 219, ¶ 17 & n.5 (stating that "where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant

are based almost exclusively on the complaining witness's testimony," participants in the trial, including "the trial court, the State, and all witnesses, should be prohibited from referring to the complaining witness as 'the victim'"). In other words, because it has not yet been conclusively established, prior to the verdict, that there is in fact a victim in such cases, reference to the complaining witness as a "victim" can be problematic. *See id.* ¶ 17 (noting that the term "victim" is defined as "the person who is the object of a crime," and use of that term might imply that a crime has been committed (quotation simplified)). One fact pattern in which this scenario often arises is where a complaining witness testifies to a nonconsensual sexual assault, and the defendant defends the case by asserting that the interactions were consensual. *See id.*

¶36    Second, the context of the specific testimony in which the term "victim" is used can make a difference. For instance, the identity of the speaker matters, and statements by a trial court are perhaps most concerning, given that juries tend to view statements by the court as neutral and authoritative. *See Vallejo*, 2019 UT 38, ¶ 99 & n.18 (stating that "improper statements made by the court are serious" and "could give a jury an impression of partiality"). And statements referring to the particular complaining witness in the case as a "victim" often are more concerning than general statements referring to victims of crime across a particular population. *See id.* ¶¶ 95, 103 (differentiating between references to the complaining witnesses as "victims," on the one hand, and "more general" uses of the term, on the other hand, such as references regarding the "generalized experience" of individuals who work with crime victims).

¶37    In this case, we cannot say that the trial court abused its discretion by denying Godinez Juarez's motion for mistrial related to use of the term "victim." First, the manner in which Godinez Juarez defended the case made it clear that Teens were indeed the victims of some sort of crime. Godinez Juarez

admitted, in his police interview, that he believed Teens "were snitching on him," and that "he wanted to teach them a lesson." He admitted that he "slapped [Teens] around," and that he had bound their legs with "weed whacker wire," and poured liquid on them from a Fiji water bottle. Constrained by this evidence, Trial Counsel acknowledged during closing argument that *something* had happened to Teens, stating, "That's not to say that nothing occurred in the house." Trial Counsel then appeared to concede that Godinez Juarez was in the house when the events in question occurred, and suggested that "had the State charged different crimes," those might have been "a better fit." Indeed, as the State accurately points out, "[t]here was no dispute" at trial that Teens "were the 'victims' of something," and "[t]he only question—as argued to the jury—was whether there was sufficient evidence to convict Godinez Juarez of the *specific* crimes" of which he was accused. Under circumstances like this, use of the term "victim" is not inappropriate.

¶38   Moreover, the context of the specific references to "victims" indicates that the references were largely innocuous, and unlikely to have so "influenced the jury that the defendant cannot be said to have had a fair trial." *See id.* ¶ 98 (quotation simplified). Two of the references were made by a detective, who explained, without being prompted, that he interviewed Teen 1 in a "victim interview room." Another reference—also unsolicited—was made by one of the responding officers, who stated that, upon arriving at the scene, he walked over to "where the victims were." And another reference came unsolicited from Teen 1, who during his testimony stated that someone had called him and "another victim" snitches, apparently referring to Teen 2. The only other reference was by the prosecutor, who reflexively responded to Teen 1's use of the phrase "another victim" by asking who that "other victim" was. We agree with the trial court that, in the context of this five-day trial, these five instances were inadvertent, cursory utterances that were unlikely to have materially influenced the jury's view of the case,

especially given the strength of the State's evidence. *Cf. id.* ¶ 100 (holding that, "given the *context* of the single statement" when the court used the word "victim," the "court did not abuse its discretion by denying the motion for a new trial" (emphasis added)); *Devey*, 2006 UT App 219, ¶ 18 (concluding that, "even if the trial court erred by denying" the defendant's "motion in limine to prohibit the State and its witnesses from referring to the [complaining witness] as 'the victim,'" "the solitary reference to the [complaining witness] as 'the victim,' in this case was not prejudicial . . . and constituted harmless error").

¶39    Finally, we note that the trial court gave a curative instruction, a tool that can sometimes, depending upon the "context" in which the statements were made, mitigate any prejudice caused by the use of the term "victim." *See Vallejo*, 2019 UT 38, ¶¶ 99–100. In *Vallejo*, the defendant faced several counts of forcible sexual abuse and moved for a mistrial based on multiple references by witnesses and the trial court itself using the word "victim." *Id.* ¶¶ 90–97. Specifically, "a police officer used the term 'victim' three times while testifying," an expert witness used the term "a total of nine times," and the judge "referred to [one of the complaining witnesses] as a 'victim' while responding to an objection." *Id.* ¶¶ 25, 28, 29. Our supreme court, while cautioning that "improper statements made by the court are serious," held that this was not reversible error in part because the trial "court gave a curative instruction." *Id.* ¶¶ 99–100. In Godinez Juarez's trial, the five references and uses of "victim" were much less frequent and egregious than those in *Vallejo*—where the word was uttered a total of thirteen times, *see id.* ¶ 91—particularly because here the trial court itself never referred to either of the complaining witnesses as "the victim." And because these comparatively more severe circumstances in *Vallejo* could properly be mitigated by a curative instruction, we have no reason to conclude differently here. *See State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887 (stating that, "in the absence of any circumstances suggesting otherwise, courts presume that

the jury follows [jury] instructions" (quotation simplified)); *accord Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("The crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge." (quotation simplified)).

¶40  For all of these reasons, the trial court did not abuse its discretion by denying Godinez Juarez's motion for mistrial because it is not reasonably likely that the five sporadic and unintentional uses of the word "victim" influenced the jury to a level that put the trial's fairness in question.

CONCLUSION

¶41  Godinez Juarez has failed to carry his burden of demonstrating that he suffered prejudice from the use of a dual-jury trial procedure in this case, and on that basis we reject his claim that Trial Counsel rendered constitutionally ineffective assistance by stipulating to that procedure. And the trial court did not abuse its discretion in denying Godinez Juarez's motion for mistrial resulting from five uses of the term "victim" at trial.

¶42  Affirmed.

————