**2021 UT App 75**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSEPH MOORE,
Appellant.

Opinion
No. 20190360-CA
Filed July 9, 2021

Second District Court, Ogden Department
The Honorable Jennifer L. Valencia
No. 181900315

Cherise M. Bacalski and Emily Adams, Attorneys
for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER and SENIOR JUDGE
KATE APPLEBY concurred.[1]

POHLMAN, Judge:

¶1    A jury convicted Joseph Moore of human trafficking of a child and other crimes. Moore appeals, claiming that his trial counsel was constitutionally ineffective in not objecting to certain expert witness testimony and in not seeking a mistrial. Because Moore has not shown that he was prejudiced by his counsel's performance, we affirm.

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

## BACKGROUND[2]

¶2    While participating in a program for troubled youth, sixteen-year-old Mindy[3] met Moore's twenty-two-year-old daughter (Daughter). The two became friends, and Daughter told Mindy about a website they could use to arrange sexual encounters with men for money. Daughter explained that men would pay more for an encounter with two girls and that together they could each make $200 to $300 per appointment. The proposal made Mindy nervous, but she liked the idea of making money to help support her family and to support her drug addiction.

¶3    Within a week, Daughter introduced Mindy to Moore. Moore, who was aware of Daughter's discussions with Mindy, suggested that Mindy have her nipples pierced "because it would attract more men." He drove Mindy to a piercing and tattoo parlor where he knew one of the employees. Because Mindy was under eighteen, Moore signed paperwork falsely stating that he was the one having his nipples pierced.

¶4    Moore also explained to Mindy that he would "partner" with the young women in the sex-for-money enterprise and that "[a]nything that [they] needed he would do." For example, he would "recommend [them] to his friends," and he would help them create online profiles and advertisements for their services using language that would not be flagged for illegal activity. He

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (cleaned up).

3. A pseudonym.

also would drive them to appointments and wait outside so that he could "protect" them "if anything went wrong."

¶5     With Moore's help, Mindy and Daughter posted their online profiles and advertisements and started taking appointments. When customers responded to an advertisement, Mindy, Daughter, and Moore would discuss when and where the encounter would occur. The three would also ensure that Moore could arrange his work schedule so that he could drive Mindy and Daughter to the appointments.

¶6     Over the next three months, Mindy and Daughter had at least one appointment almost every day in which they engaged in sex for money. In exchange for Moore's assistance in setting up the appointments, providing transportation, and acting as their "muscle," Mindy and Daughter paid him part of the proceeds they earned. They also often paid for Moore's meals and gas. Overall, Mindy estimated that she paid Moore about forty percent of her total earnings.

¶7     Moore's involvement in the operation ran smoothly until Mindy decided to end the arrangement because she felt that she and Daughter were "being bossed around and [she] didn't really like that . . . [and] it became more like [Moore] was the boss." He decided which appointments the young women went to and which ones they did not. Gradually, Mindy felt that they were doing more of what Moore wanted and less of what Mindy and Daughter wanted.

¶8     The enterprise eventually raised suspicion, and Mindy and Daughter both confirmed to authorities that Moore had helped them engage in a commercial sex operation for nearly three months. The State charged Moore with one count of human trafficking of a child, one count of aggravated exploitation of a child prostitute, and one count of exploiting

prostitution. Moore pleaded not guilty, and the case was set for trial.

¶9     At trial, the State called as its first witness a professor (Expert) "to educate the jury on human trafficking" and to dispel some "common misconceptions" about the subject. She explained that human trafficking generally occurs when a person "recruits, obtains, harbors, transports . . . or entices" others through force or fraud "for the purpose of their sex or labor." She further explained that children engaged "in sexual economies," including prostitution and pornography, are considered "sex trafficked" because children "cannot consent to their own abuse."

¶10     Expert then explained that individuals who are trafficked vary by age, race, and class, and it "is not just an international phenomenon"; it occurs in Utah and throughout the United States. She also explained that a person does not have to be kidnapped to be trafficked; rather, one can "be trafficked out of their own home" and even by a parent. She further explained that those who are trafficked are not always "locked up in basements" or "hidden from sight," and that while some will report the trafficking almost immediately, others may stay in "abusive conditions" for years and even decades. She stated that a trafficker "might break a person's will to leave" by debilitating or "literally" exhausting that person.

¶11     Expert testified that traffickers employ a range of recruitment methods. Some use force or violence to compel someone to participate in a sex-for-money enterprise; others establish a romantic relationship with an individual and then appeal to that individual's emotional needs to impel participation. In other cases, a trafficker may employ a business methodology whereby the trafficker appeals to an individual's need for money. Someone who is impoverished or has a drug addiction may be particularly vulnerable to a trafficker's

proposal. Expert also described "peer to peer recruitment," explaining that someone being trafficked may be used to recruit others.

¶12    Expert also described the trauma one who has been trafficked may experience. She explained that individuals may be fearful, angry, and depressed and that the trauma associated with being trafficked can impact a person's memory. Expert also identified some of the red flags that might indicate a minor is being trafficked, including missing school, falling asleep frequently, and suddenly having nice things.

¶13    Finally, Expert testified about the different ways sex trafficking is advertised, including through websites and on social media. She also explained that trafficking is a lucrative business because a trafficker can "sell a person over and over again." And child trafficking can be especially lucrative in part because of the "huge demand" for young girls known as "cherry girls" who "just had their first period."

¶14    Throughout Expert's testimony, she used the word "survivor" to refer to individuals who have been trafficked. She (along with the prosecutor) also used the word "victim" a handful of times.[4] But Expert never used either word in reference to Mindy or Daughter, nor did she opine on whether Moore had engaged in human trafficking. She acknowledged that she knew nothing about the facts of the case and was speaking only generally.

---

4. Early in her testimony, Expert contrasted the two words, explaining that "survivor" refers to someone who "has survived some sort of traumatic events," while "victim" is often used to refer to a "legal victim," that is, someone who could "have had a legal case."

¶15    Moore's trial counsel did not object to the relevance of Expert's testimony. But after Expert testified, the district court noted outside the presence of the jury that it needed to find that Expert's "testimony was appropriately entered" under Rule 702 of the Utah Rules of Evidence,[5] and it expressed concern that "various parts of her testimony . . . didn't seem to have applicability to the facts of this case." The court observed that Expert "essentially provide[d] a lecture to the jury on human trafficking," and that some of her testimony, including the "comments about children being virgins," were disconnected from the actual facts. Still, the court noted that the lack of an apparent "direct[]" connection to this case "could cut two different ways," and it invited the parties to submit briefing on the testimony's admissibility.

¶16    In response, the State filed a memorandum; Moore's trial counsel did not. The State argued that although some parts of Expert's testimony "did not readily apply to the facts of this case," other parts would be useful to the jury in understanding Mindy's "behaviors." To address the testimony that "may not have applied to the evidence [the jury] heard," the State suggested a cautionary instruction informing the jury that it could disregard irrelevant testimony.

¶17    The district court raised the issue again while reviewing the proposed jury instructions with counsel. Moore's counsel agreed that the jury should be cautioned "that some of what

---

5. Rule 702 of the Utah Rules of Evidence governs the admissibility of expert testimony. Trial courts perform a gatekeeping function relative to expert testimony and are tasked with ensuring that the principles forming the basis of the expert's testimony are reliable, are based on sufficient facts or data, and "have been reliably applied to the facts" of the case. *State v. Turner*, 2012 UT App 189, ¶ 18, 283 P.3d 527 (cleaned up).

[Expert] said is not applicable to this case," but counsel was wary about overemphasizing any particular aspect of the testimony. After additional discussion with both attorneys, the court ultimately instructed the jury, "Some portions of the expert testimony may not apply to the evidence you heard. You may choose not to consider any portions of the expert testimony about human trafficking that are not applicable to the evidence presented."

¶18    After Expert testified, Mindy took the stand. She explained how she came to be involved in a commercial sex enterprise with Daughter and Moore, and she described the specifics of Moore's involvement. She admitted that as the result of trauma and drug use, "[t]here [were] bits and pieces" of the relevant period that she could not recall, but she remembered "the majority of what happened." And when asked whether she might have lied because she was angry with Moore, she stated that she was "not mad at [him]" and did not "wish bad things upon [him]."

¶19    Although Daughter did not testify at trial, another of Moore's daughters (Second Daughter) did. Second Daughter testified that on several occasions, Moore told her that he had taken Daughter and Mindy "to Salt Lake to meet a guy to have sex and then they would pay him for driving them out there and to drive them back to Ogden." She further testified that Moore had described how he helped Daughter create a profile on a website used to advertise prostitution.

¶20    Moore's stepdaughter (Stepdaughter) also testified. She stated that "a few times" Moore told her "that [Daughter] was behind on rent [she owed Moore for the house they shared] and she ha[d] to have sex with people for money in order to help pay the rent." When asked whether she would lie to get Moore convicted, Stepdaughter said "no" and that she wanted only "to have justice served on [Moore] for the things that he's done."

¶21 In addition to Moore's family members, Mindy's sister testified. She described receiving an expensive makeup palette as a surprise gift from Mindy while they were eating lunch with Daughter and Moore. She further explained that during the lunch, Moore told her he was "really struggling" and he "need[ed] to find some girls to pimp out." At first, she thought Moore must have been joking. But when she realized he was serious, she made it clear that she was not interested. She left the lunch concerned that Mindy was involved in prostitution.

¶22 In his defense, Moore called four character witnesses. First, he called the operator (Bus Driver) of the UTA bus that Moore rode with his wife and school-aged daughter two to three times per week over a five-year period. Bus Driver testified that during that time he never overheard Moore mention prostitution. But Bus Driver also testified that Moore had once shown him a picture of Daughter that appeared to be an online solicitation for prostitution and that Moore was "[u]pset" by it. And when Bus Driver was asked if he recalled talking to a detective about Bus Driver "paying [Daughter] for sex," he invoked his right under the Fifth Amendment to not answer the question.[6]

¶23 Next, Moore elicited testimony from his neighbor and his neighbor's daughter, each of whom had known Moore for years. Each denied any knowledge of a prostitution business, and the neighbor's daughter testified that Moore had never been inappropriate with her. Similarly, Moore's former coworker testified that during the many years she had known him, she had never heard him talk about prostitution and had never seen him act inappropriately around young women.

---

6. The detective subsequently testified that Bus Driver told the detective that he had paid Daughter for sex and that he had made the arrangements "one on one with her."

¶24 The jury found Moore guilty as charged. He now appeals.

ISSUES AND STANDARD OF REVIEW

¶25 Moore contends that his trial counsel was constitutionally ineffective for not objecting to irrelevant portions of Expert's testimony and for not objecting to Expert's use of the words "victim" and "survivor." He also contends that trial counsel was constitutionally ineffective for not seeking a mistrial after the district court raised concerns about the relevancy of Expert's testimony. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344 (cleaned up).

ANALYSIS

¶26 "The Sixth Amendment to the United States Constitution guarantees a criminal defendant the assistance of counsel for his defense, meaning that he has the right to effective assistance of counsel." *State v. Bond*, 2015 UT 88, ¶ 59, 361 P.3d 104 (cleaned up). To prevail on an ineffective assistance of counsel claim, a defendant must make two showings: (1) that "counsel's performance was deficient" and (2) that the "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first element, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688. Under the second, a defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

¶27 To satisfy the second element of the inquiry, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

Rather, "consider[ing] the totality of the evidence before the judge or jury," *id.* at 695, a defendant must "demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error," *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350; *see also Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. This "is a relatively high hurdle to overcome." *State v. Garcia*, 2017 UT 53, ¶ 44, 424 P.3d 171.

¶28   If we determine that Moore has made an insufficient showing on either element of the ineffective assistance inquiry, we "need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031. For the reasons explained below, we conclude that Moore's ineffective assistance claims fail because he has not established prejudice with respect to either claim.

A

¶29   Moore contends that his trial counsel was ineffective because he did not object to Expert's "irrelevant and inflammatory testimony." He argues that Expert's testimony regarding "child trafficking scenarios that had nothing to do with" the charges against him "inflamed the jury and prevented [him] from having a fair trial." Similarly, Moore argues that Expert's use of the words "survivor" and "victim" "were emotionally charged" and "colored the way" the jury viewed Mindy and Daughter from the trial's outset. He further posits that "had the jury not heard the inflammatory information it heard in the beginning, it might have been able to remain neutral and consider the strength of . . . Moore's evidence when compared to the State's evidence."

¶30   Even if we assume that trial counsel performed deficiently in not objecting to certain aspects of Expert's testimony, we disagree with Moore's assessment of the impact that testimony had on the jury. For a combination of reasons, we do not view it

as reasonably likely that the jury would have reached a different verdict if portions of Expert's testimony, including her use of the words "victim" and "survivor," had been excluded.

¶31    First, we reject the premise of Moore's argument that Expert's testimony inflamed the jury. Moore describes Expert's testimony as a "litany of graphic, disgusting, horrific images of children trafficked into the sex trade in truly horrific ways." We view the testimony differently. To be sure, the subject of human trafficking is disturbing and some of the details Expert mentioned are undoubtedly alarming. But Expert did not paint graphic and horrific images for the jury; she offered few examples and testified in a clinical fashion.

¶32    Second, Moore surmises that Expert's testimony "roused the jury to fear or vengeance toward [him]," reasoning that the jury "could not regulate its emotional response" to the evidence because the testimony lacked context. But before Expert testified, the jury did know something of the circumstances of the case. It heard in opening statements that this was a prostitution case involving a sixteen-year-old who was introduced to Moore by Moore's twenty-two-year-old daughter. It also understood that the State would try to prove that the three discussed "the girls engaging in commercial sex" and that Moore assisted them by helping to create advertisements and by providing them transportation and security. Thus, although Expert mentioned various human trafficking scenarios, including children being kidnapped and others being held against their will, there was little risk that the jury would have understood every scenario to apply in this case.

¶33    Further, Expert affirmed that she knew nothing of the relevant facts. She spoke in generalities and offered no opinion on whether Moore had engaged in any of the forms of human trafficking. She also never referred to Mindy or Daughter, and she used the word "survivor" to refer generally to individuals

who have been exploited. We "recognize the gravity of referring to witnesses as victims during a trial," *State v. Vallejo*, 2019 UT 38, ¶ 102, 449 P.3d 39, but "statements referring to the particular complaining witness in the case as a 'victim' often are more concerning than general statements referring to victims of crime across a particular population," *State v. Juarez*, 2021 UT App 53, ¶ 36. And here, where Expert referred to a range of individuals and made no reference to Mindy or Daughter, it is less likely that the jury was unduly influenced by the use of either word.

¶34 Third, the prosecutor's limited use of Expert's testimony in closing argument, and the court's cautionary instruction that the jury could disregard any expert testimony it deemed irrelevant, further tempered the testimony's effect. Consistent with the court's instruction, the prosecutor conceded that Expert's testimony was "broad" and "general" and that some of the scenarios she described were not applicable "because she hadn't reviewed the evidence" in Moore's case. Plus, the prosecutor referred only to relevant portions of Expert's testimony (for example, peer-to-peer recruitment, red flags, and a minor's inability to consent) and omitted any discussion of the portions Moore argues were inflammatory (kidnapping, trafficking by parents, and trafficking young virgins).

¶35 Finally, in assessing prejudice based on trial counsel's alleged deficient performance, our "analysis is counterfactual." *State v. Ring*, 2018 UT 19, ¶ 36, 424 P.3d 845. "To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *Id.* (cleaned up). Here, Moore invites us to assess the likely outcome of a hypothetical trial in which Expert did not use the words "survivor" or "victim" or testify about human trafficking scenarios untethered to the facts of the case. We consider that alternative universe and conclude that it is not reasonably likely that the jury would have reached a different result.

¶36 The State's case against Moore was strong. Mindy testified consistently and unequivocally about Moore's active participation in her and Daughter's prostitution. She described her first meeting with Moore, his encouragement and facilitation of her body piercing, and his assistance in creating advertisements, setting up appointments, providing transportation, and providing security. Her testimony demonstrated that Moore was well aware she was a minor and that, at the very least, he knowingly or recklessly transported Mindy and Daughter for the purpose of promoting their engagement in prostitution and that he shared in the proceeds of their enterprise.[7] And although Mindy admitted to having some memory loss due to trauma and drug use, her testimony included considerable detail and Moore has not suggested that her memory was so poor that she could not accurately recall that Moore transported her and Daughter to their appointments nearly every day for three months. Further, other than pointing

---

7. The jury could find Moore guilty of human trafficking of a child if it found that he had intentionally, knowingly, or recklessly transported Mindy, a person younger than eighteen, "for sexual exploitation." *See* Utah Code Ann. § 76-5-308.5(2) (LexisNexis 2017); *id.* § 76-5-307(1) (defining child as "a person younger than 18 years of age"); *id.* § 76-2-102 (identifying applicable mental states). Similarly, the jury could find Moore guilty of aggravated exploitation of a child prostitute if it found that he had intentionally, knowingly, or recklessly encouraged Mindy "to become or remain a prostitute," transported her within the state "with a purpose to promote [her] engaging in prostitution," or "share[d] the proceeds of prostitution with [Mindy]." *See id.* §§ 76-10-1305(1)(b)–(c), -1306(1)(b); *id.* § 76-2-102. Finally, the jury could find Moore guilty of exploiting prostitution if it found that he had done any of the same with Daughter. *See id.* § 76-10-1305(1)(b)–(c); *id.* § 76-2-102.

to Mindy's inability to recall "bits and pieces" of the relevant period, Moore has identified no reason for the jury to disbelieve her. In fact, Mindy testified that she was not angry with Moore and did not wish him harm.

¶37    Moreover, Mindy's testimony did not stand alone. Mindy's sister provided incriminating evidence, testifying that Moore had told her during the relevant period that he "need[ed] to find some girls to pimp out." And Moore's own family members testified that he had repeatedly admitted to facilitating the prostitution enterprise. Second Daughter testified that Moore admitted to her that he helped Mindy and Daughter with their online advertisements and drove them to their appointments; Stepdaughter testified that Moore stated more than once that Daughter needed to prostitute herself to help pay their rent.[8]

¶38    Further, although Moore contends that he "mounted a strong defense," we share the State's view that it was "anything but 'strong.'" Neighbors and a coworker testified that they were unaware of Moore's prostitution scheme, but it proves little that select acquaintances were unaware of Moore's criminal activity. And although Bus Driver testified that he was surprised to hear that Moore was accused of facilitating prostitution, Bus Driver's testimony likely caused more harm than good when he admitted that Moore shared Daughter's online advertisement with him

--------

8. Moore offered no reason to doubt the testimony of Mindy's sister but contends that Stepdaughter was biased against him and the credibility of Second Daughter's testimony "was up for debate." Stepdaughter did admit that she would not speak to Moore's defense investigator and she testified that she only wanted to see Moore receive justice "for the things that he's done." Second Daughter testified that her relationship with Moore was "rocky," but she stated that she had no reason to lie about what Moore told her, and her testimony matched Mindy's.

and independent evidence was introduced that Bus Driver had paid Daughter for sex.

¶39    In sum, we are not persuaded that if Moore's trial counsel had objected to portions of Expert's testimony and her use of the words "victim" and "survivor" that the outcome of the case would have been any different. Her testimony was clinical in nature and we are confident that the jury was not so inflamed by the general scenarios she described that it could not remain neutral and fairly evaluate the evidence presented. Further, the State's case against Moore was strong, and it is not reasonably likely that the jury would have reached a different verdict had Expert avoided the allegedly off-limits testimony.

B

¶40    Moore next contends that his trial counsel was ineffective "when he failed to move for a mistrial once the trial court invited him to weigh in on the irrelevant expert testimony." Mirroring the arguments made above, Moore reasons that "[a]nother trial was necessary" because Expert's testimony so incited "the jury's sympathies" against him that he "never had a chance."

¶41    To prevail on this claim, Moore must once again show a reasonable probability that the outcome of his case would have been different absent counsel's error. *See State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350. In other words, Moore must demonstrate that it is reasonably likely the court would have granted a motion for a mistrial had one been made. If the motion would have been futile, his claim necessarily fails. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome.").

¶42　We conclude that Moore's claim fails because he has not shown a reasonable probability that the district court would have granted a motion for mistrial based on Expert's testimony. In fact, the record strongly suggests that the court would have denied such a motion.

¶43　"A mistrial is strong medicine." *State v. Whytock*, 2020 UT App 107, ¶ 16, 469 P.3d 1150. Our supreme court has stated that a "trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (cleaned up); *see also State v. Roberts*, 2019 UT App 9, ¶ 15, 438 P.3d 885 ("Declaring a mistrial is a particularly drastic remedy that is warranted only when no reasonable alternatives exist." (cleaned up)).

¶44　Given that standard, it is not reasonably likely that the court would have granted a mistrial had one been requested. As explained above, Expert's testimony did not deprive Moore of a fair trial. *See supra* ¶¶ 30–36. Although portions of the testimony were admittedly unrelated to the facts of the case, Expert's testimony did not inflame the jury against Moore such that a mistrial was "necessary to avoid injustice." *See Butterfield*, 2001 UT 59, ¶ 46.

¶45　Further, we acknowledge that the district court voiced concern about the scope of Expert's testimony. But its concern was not that Expert's testimony unfairly prejudiced Moore. In fact, the court observed that the testimony "could cut two different ways." The court was instead concerned that it could not properly admit some of the testimony under Rule 702 of the Utah Rules of Evidence because it was disconnected from the facts.

¶46 The court ultimately resolved its concern by cautioning the jury that it could disregard any irrelevant portions of Expert's testimony. Moore has not pointed to anything in the court's statements or reasoning to lead us to believe that the court would have abandoned that approach in favor of declaring a mistrial. Thus, Moore's trial counsel did not render ineffective assistance by not moving for a mistrial.

## CONCLUSION

¶47 We conclude that even assuming trial counsel acted deficiently by not objecting to Expert's testimony or by not moving for a mistrial, Moore was not prejudiced as a result. The irrelevant portions of Expert's testimony and her use of the words "victim" and "survivor" were not so inflammatory that Moore was deprived of a fair trial. Further, Moore has not persuaded us that there is a reasonable probability that the jury would have reached a different verdict had these portions of Expert's testimony been eliminated. Finally, we are not persuaded that even if Moore's trial counsel had moved for a mistrial that the court would have granted it. For these reasons, we affirm.

———————